Cherie **BURRELL**, Plaintiff,

v.

**CITY UNIVERSITY OF NEW YORK**
**and Dr. Stanford A. Roman, Jr.,**
**Defendants.**

No. 94 Civ. 8711 (RWS).

United States District Court,
S.D. New York.

Aug. 17, 1995.

Dienst & Serrins, New York (Alan Serrins, Traycee Ellen Klein, of counsel), for plaintiff.

Dennis C. Vacco, Attorney General of State of New York, New York City (Marion R. Buchbinder, Assistant Attorney General, of counsel), for defendants.

## OPINION

SWEET, District Judge.

In this sexual discrimination action, defendants City University of New York ("CUNY") and Dr. Stanford A. Roman, Jr., M.D. ("Roman") (collectively, CUNY and Roman are the "Defendants") move, pursuant to Fed.R.Civ.P. 56, for an order granting summary judgment. For the reasons set forth below, Defendants' motion will be denied in part and granted in part.

### The Parties

Plaintiff Cherie Burrell ("Burrell") is a resident of Laurelton, New York.

Defendant CUNY is a public higher education system comprised of several senior and community colleges throughout New York City and its boroughs, including CUNY Medical School/Sophie Davis School of Biomedical Education ("Sophie Davis").

Defendant Roman is the Dean of Sophie Davis.

### Prior Proceedings

Burrell filed her complaint in this action on December 2, 1994 and Defendants made the instant motion for summary judgment on March 16, 1995. The motion was argued on June 7, 1995 and was deemed fully submitted at that time.

### Facts

The alleged discrimination underlying this action occurred in a series of incidents, the facts of which are in substantial dispute. Defendants, in the instant motion for sum-

mary judgment, contend that Burrell's claim based on sexual harassment is jurisdictionally barred. With respect to Burrell's claim for retaliatory termination, which concededly is not jurisdictionally barred, Defendants contend that Burrell has failed to make out a *prima facie* case of retaliation.

All material factual allegations with respect to Burrell's claim for sexual harassment are gleaned from Burrell's complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motion.

In September of 1990, Burrell[1] saw a print advertisement for a position as "Assistant to the Dean" of Sophie Davis. The advertisement sought applicants with "strong interpersonal, verbal and written skills and ability to work with a minimum of supervision," and listed among the position's responsibilities: "compile research and assemble background documents needed for meetings and other activities of the Dean. Coordinate meetings and special events. Prepare, develop, review and edit reports and other written communications for the Dean." The salary was advertised as between $28,630 and $38,465, depending on experience. Interested candidates were instructed to send a resume and references to Roman.

In October of 1990, Burrell had an initial interview for the position with Roman. More than a year later, in December of 1991, she received a letter from Defendants informing her that the position was vacant and that, if she was still interested in the job, she should contact the Dean's Office.

In January of 1992, Burrell and Roman met for another interview, during which Burrell first raised the subject of her eligibility to work in the United States. Burrell told Roman that, although she was not a United States citizen, the Immigration and Naturalization Service ("INS") had issued her an "H–1" visa[2] authorizing her to work for her former employer.

Burrell's H–1 visa was issued by the INS on May 2, 1990 and authorized her to work for AFS Intercultural Programs, Inc. until April 17, 1993. Thus, in order for Burrell to work legally for Defendants, CUNY needed to petition the INS for a transfer of Burrell's visa. When Burrell mentioned her visa status during her second interview with Roman, Roman told her: "No problem, we deal with these all the time," and assured her he would take care of any paperwork necessary to transfer her visa.

One week after her second interview with Roman, Burrell was hired for the period from January 21, 1992 through June 30, 1992, at an annual salary of $35,763. Roman told Burrell she could begin working while the paperwork for her visa transfer was being processed, and Burrell commenced working for Defendants on January 21, 1992. On the first day of her employment, Burrell filled out CUNY's Employment Eligibility Verification Form ("I–9 form"), and submitted the form to Helga Johnson ("Johnson"), a personnel official in the Dean's Office. Burrell's I–9 form indicated that she was an alien authorized to work in the United States under a valid passport and accompanying work authorization documents.

The next day, Johnson asked Burrell to submit a copy of her greencard for CUNY's files. Surprised that Roman had not informed Johnson about her visa status, Burrell approached Roman and reminded him of the need to prepare a petition for the transfer of her visa. Roman assured Burrell that he would take care of the matter. Several days later, Johnson again requested a copy of Burrell's greencard. Burrell again ap-

---

1. At the time of the incidents described herein, Burrell was known by her maiden name, Thorpe.

2. An "H–1" visa is granted by the INS, upon petition by a prospective employer, to non-immigrants who are to be brought into the United States by the prospective employer to perform, *inter alia*, "specialty occupations," as that term is defined in § 214(i)(1) of the Immigration and Naturalization Act, codified at 8 U.S.C. § 1184.

An H–1 visa enables a prospective employee to work for a specific employer for a limited period of time. The employee may not use the visa to work for other employers. 8 C.F.R. § 214.2(h)(2)(i)(D). If an employee seeks additional employment after working for the authorized employer, the new employer must petition the INS to sponsor a transfer of the employee's visa.

proached Roman, who said he had spoken about the matter with Eleanor Chin ("Chin"), then Acting Director of Administrative Affairs at Sophie Davis. Roman assured Burrell that Chin would process all paperwork necessary to transfer sponsorship of Burrell's visa.

Shortly thereafter, Burrell met with Chin to discuss her visa status. At that time, Burrell asked Chin to read a letter from Burrell's former employer outlining the required procedure for transferring sponsorship of her visa to a new employer. Chin read the letter and asked Burrell to bring her passport and visa to Johnson. Burrell presented those documents to Johnson, who made copies for Sophie Davis' files.

The sexual harassment complained of in this action allegedly began on Burrell's first day of employment. Roman requested Burrell's home telephone number for his private address book. Burrell thought the request odd because Roman had telephoned her at home once before, in order to offer her the job. She informed Roman that her telephone number was unlisted in order to avoid receiving annoying calls. After Roman explained that he did not usually call employees at home except in emergency situations, Burrell gave Roman her number.

Roman began making comments to Burrell at work, such as: "I like your style," "you are a class act," and "we communicate so well with each other." On noticing a photograph on Burrell's desk, Roman inquired of Burrell whether the individual in the picture was her brother. Burrell informed him that the photograph was of her fiancé. Thereafter, Roman made it a habit, when walking past Burrell's desk, to knock the picture over and ask Burrell whether she wanted him to pick it up.

On February 14, 1992, St. Valentine's Day, Roman had flowers and chocolates delivered to Burrell's home.[3] At a meeting with Roman a few days later Burrell said: "I guess I should say 'thank you' for the flowers?" Roman replied "You said that as if you did not appreciate them." Burrell explained that the gift made her very uncomfortable because it might cause tension between her and her fiancé, and asked Roman not to send packages to her home in the future. Roman responded: "you should relax; there is nothing wrong with being a little bit vulnerable; there is no reason to always be on the defensive." Approximately two weeks after this conversation, Roman had an $177 leather writing portfolio delivered to Burrell's home with a note that said "Just to help you get it together. Stan Roman."

Some time in February of 1992, Burrell mentioned to Roman that her workspace was insufficient. Roman told her to order a new desk and work station. Burrell selected several items from a catalog of regulation furniture and presented Roman with her requests. Roman told her not to worry about choosing regulation furniture and, instead, arranged for his chauffeur to take Burrell to a furniture dealer in Queens. Several items were purchased at a total price of $3,381.81. After the items were delivered, Roman admonished Burrell to be careful about making Chin jealous because Chin's office furniture was of an inferior quality.

Roman continued making comments to Burrell at the office. In March of 1992, he told her he did not think any man could resist her and stated: "from here on I will use you as the acid test for men that come into this office. If they can get past you, I know they're alright." Burrell told Roman she thought his remark was sexist and he responded: "take it as a compliment; you're hard to resist."

Roman began asking Burrell to go to dinner with him. He frequently called her into his office for meetings at 4:50 p.m., which lasted until long after the other employees had gone home for the day. In one such meeting, Roman stated that he was aware of rumors that he and Chin had had a romantic relationship, and told Burrell that he wanted to set the record straight. Burrell replied that his personal life was none of her business. Nevertheless, Roman proceeded to ex-

---

**3.** A note accompanying the flowers read: "Best wishes on Valentine's Day. Thank you. Stan Roman.

plain in detail how he had met and hired Chin. Roman denied that he and Chin had been romantically involved.

Also in March of 1992, Roman began calling Burrell at home, frequently to invite her to dinner. On one occasion, Roman called to apologize for being demanding on Burrell in the office. Roman explained that he could not let it appear to others in the workplace that he liked Burrell. Roman told her she was very special to him and went on to tell her about his three failed marriages and various extramarital relationships. He also told her that he "slept around" a lot.

One day, while interviewing candidates for the position of Dean's Office Secretary, Burrell received a telephone call from Roman, who was out of town. Roman inquired whether anyone else was in the office. When Burrell informed him that an interviewee was in the room, Roman told her to transfer the call to his office and pick it up there. When Burrell picked up the call, Roman remarked that he had never before noticed how sexy Burrell's voice sounded over the telephone. Roman asked "by the way, have you ever done it over the phone?" Burrell replied: "Done what?" Roman said: "your voice does something to me. You know what I'm talking about. I think you could do a really good job of it." Burrell told Roman that the conversation was "most inappropriate." Undeterred, Roman proceeded to recount a past experience with a woman who "used to call me every now and then and help me get it off over the phone." Roman told Burrell he knew there was "fire" underneath her prudishness. Burrell hung up the phone. That night, Roman called Burrell at her home but she refused to talk with him.

In her affidavit, Burrell explains why she continued to work in the environment that had developed at work.

> ... I was feeling extremely doleful, harassed and pressured over the situation that had developed with Dean Roman, not only because he was my boss and the head of the entire school, but also because he controlled whether my visa would be transferred. I knew that until Dean Roman completed the paperwork for my H–1 visa to be transferred from my previous employer to [CUNY], that he held all the cards. I was for all intense of purposes [sic] under his control. I needed my job to support my family ...

In late April of 1992, Roman called Burrell into his office and inquired whether she had changed her mind about having dinner with him. Roman asked her whether she had considered the impact her marriage would have on her career. Roman reminded her that he could withdraw his support for her at any time. Burrell understood this to refer to CUNY's sponsorship of her visa transfer, which still had not been processed.

On April 24, 1992, approximately two months before Burrell's contract was due to expire, Roman offered her a one-year renewal contract, which Burrell signed on May 1, 1992. Shortly after Burrell signed the renewal contract, Roman's attitude toward her began to change. He became openly critical of her work and held her responsible for the mistakes of other employees. Around May 1, 1992, Roman told Burrell: "I am willing to work with you to keep you in this job ... I like you, but nothing comes easy ... I could easily withdraw my support of you in this office ... Let me remind you that the road is filled with the carcasses of people who have held this job before you." On May 10, 1992, Mother's Day, Roman had a basket of orchids delivered to Burrell's home.

On May 15, 1992, two weeks after Burrell signed the renewal contract, Roman gave Burrell a written memorandum criticizing her for, among other things, allowing an advertisement for a job offering to be published when the position had already been filled. The memo also recapitulated a May 6, 1992 conversation in which Roman had identified several deficiencies in Burrell's performance, including:

A. Planning and organizing work and work flow.

B. Establishing priorities so that work efforts are not merely a series of discrete and equal tasks.

C. Appropriate communication with subordinates, peers, and the public which minimizes unnecessary conflict.

D. Developing team efforts among subordinates.

E. Training of subordinates to appropriately and effectively function.

On May 18, 1992, Burrell went to CUNY's Affirmative Action Office to complain about her experiences with Roman. She was interviewed there by Dean Manuel de la Nuez ("de la Nuez") and Gloria Medonne ("Medonne"), the Director and Assistant Director, respectively, of the Affirmative Action Office. During the interview, Burrell recounted the series of incidents described above while Medonne took notes. Burrell indicated that she did not want to work for Roman any longer, but that she was concerned about finding other employment and would be willing to take another position within CUNY. Medonne advised Burrell to submit her complaint in writing and to retain an attorney. Medonne also told Burrell that the Affirmative Action Office would conduct an interview with Roman regarding Burrell's complaint, and that it would be impossible to do so without identifying Burrell as the person who made the complaint. Several days after complaining to the Affirmative Action Office, Roman told Burrell he heard she had visited the Administration Building (where the Affirmative Action Office is located), and that he would "not let [her] be destructive."

Roman was interviewed by de la Nuez and Medonne on May 28, 1992. Medonne's notes of the interview indicate that Roman was asked if he knew why Burrell had made a complaint against him. Roman stated that Burrell's work performance was unacceptable and that his staff had told him she was incompetent. De la Nuez and Medonne asked Roman, if that were true, why he had given her such a glowing evaluation and renewed her contract for one year. Roman replied he had been unaware of Burrell's problems at the time he renewed her contract. Roman denied all of Burrell's allegations and told de la Nuez and Medonne he had no intention of keeping Burrell in her position any longer. De la Nuez and Medonne advised Roman not to fire Burrell and stressed that there could be no retaliation against her for filing a complaint. Roman agreed to look into transferring Burrell to another department while the Affirmative Action Office investigated her complaint.

Burrell took two days leave from work, assertedly to collect her thoughts and work on her written complaint to the Affirmative Action Office. Upon returning to work, Roman told Burrell he hadn't realized how dangerous she could be, but said he would "take care of it." Other employees informed Burrell that her desk had been searched in her absence. In addition, the access code for Burrell's private voice mail had been changed and the files on her computer had been erased. During this period, Roman gave Burrell several memoranda criticizing her performance. Burrell alleges that, on several occasions, Roman and Chin removed office files and subsequently blamed Burrell for misplacing them. On June 2, 1992, Roman gave Burrell a memorandum transferring her, effective June 3, to an administrative position in CUNY's Learning Resources Center.

By letter to Burrell dated June 25, 1992, Chin requested that Burrell provide Johnson with a copy of her "H–1 petition." Chin noted that Burrell's contract with CUNY had been extended until June 30, 1993, but that CUNY's records indicated that Burrell's eligibility to work would expire on April 17, 1993. Chin sent copies of the letter to Roman, Johnson and Stephen Nisbett, CUNY's Director of Personnel, who was responsible for, *inter alia*, "ensur[ing] that [hiring decisions] comply with applicable statutory and administrative requirements."

Burrell responded to Chin's request by letter dated July 20, 1992, in which she reminded Chin that Roman had agreed to sponsor the transfer of her H–1 visa to CUNY, and that Roman had repeatedly assured her that Chin would be responsible for handling the matter. Burrell also noted that the petition for a visa transfer is a document prepared by the sponsoring employer, not the employee, and, therefore, that she could not produce the H–1 petition Chin had requested. Burrell sent copies of her July 20 letter to Roman, Johnson and Nisbett.

In late July of 1992, Nisbett contacted Evelyn Conti ("Conti"), a CUNY administrator responsible for providing information

about INS rules to CUNY's constituent colleges. Conti confirmed to Nisbett that H–1 visas are issued on the petition of the new employer and are not transferrable to another employer. Nisbett then sent a letter to Burrell, dated July 31, 1992, noting that Burrell had failed to provide the H–1 petition to Johnson, as requested in Chin's June 25 letter to Burrell. Nisbett noted that it was essential for CUNY to have a copy of "the requested documentation" in its files in order to comply with regulations governing the employment of aliens on H–1 visas. Nisbett also indicated that he would be making a decision on Burrell's "status for continued employment" and requested that she make an appointment with him to discuss the matter before August 7, 1992.

On August 4, 1992, Roman sent a letter to Nisbett regarding Burrell's contention that Roman had agreed to sponsor the transfer of her H–1 visa. In the letter, Roman gave an account of his second interview with Burrell:

> I did comment to her that I assumed that she was a permanent resident of the U.S. She said that this was no problem her lawyer handles all that, I had no further discussion of Ms. [Burrell's] immigration status.... Naturally, I assumed [Burrell's] immigration status was legal. I was surprised to learn several months later that she had an H–1 status and had inappropriate credentials. Frankly, until this time I didn't even know what an H–1 visa was.... It would be a travesty for an institution like the City University of New York to have to sponsor an individual to work as an administrative assistant given the availability of qualified legal applicants.

By letter dated August 14, 1992, Nisbett informed Burrell that, because she had not responded to his July 31, 1992 letter, and because CUNY must comply with federal regulations governing employment of aliens, her employment with CUNY would be terminated effective August 31, 1992.

On May 10, 1993, Burrell filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that Roman had sexually harassed her, and asserting that her June 2, 1992 transfer and August 31, 1992 termination were in retaliation for filing

a complaint with CUNY's Affirmative Action Office. After 180 days had passed without an EEOC determination on her complaint, Burrell requested and received from the EEOC, on September 2, 1994, a Notice of Right to Sue, giving her the right to file a civil action within 90 days of receipt of the letter.

On December 27, 1994, Burrell commenced the instant action, asserting separate causes of action for (i) sexual harassment in violation of Section 700(g) of Title VII of the Civil Rights Act of 1964 ("Title VII"), codified in relevant part at 42 U.S.C. § 2000e–5(f) and (ii) retaliatory termination in violation of Section 704(a) of Title VII, codified in relevant part at 42 U.S.C. § 2000e–3(a).

### *Discussion*

### *Rule 56 Standard for Summary Judgment*

The Rule 56 motion for summary judgment is an "integral part" of the Federal Rules of Civil Procedure and facilitates the overall purpose of the Rules stated in Rule 1, namely, "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ. of New York,* 947 F.2d 1021, 1022 (2d Cir.1991).

The Second Circuit has repeatedly noted that "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting) and *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176

(1962); *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York,* 716 F.2d 982, 983–84 (2d Cir.1983). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991).

■ In addition to the foregoing standards, the Second Circuit has held that additional considerations must be taken into account when deciding whether summary judgment should issue in an employment discrimination action. *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir. 1994); *see also Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's documents, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination. *Gallo* at 1224. This standard is applied to the instant motion.

### Burrell's Sexual Harassment Claim is Time–Barred

■ Title VII requires persons aggrieved by an employer's discriminatory acts or practices to file a complaint with the EEOC within one hundred and eighty days of such acts or practices. *Delaware State College v. Ricks,* 449 U.S. 250, 256, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980) (quoting 42 U.S.C. § 2000e–5(e)). In states such as New York, however, where an agency addresses charges of discrimination, the employee must file an EEOC complaint within three hundred days. 42 U.S.C. § 2000e–5(e). Title VII's filing requirements are similar to statutes of limitations, which begin to run when the employee knew or should have known of the allegedly discriminatory act. *Morse v. Univ. of Vermont,* 973 F.2d 122, 125 (2d

Cir.1992). When an employee fails to file an EEOC complaint within the specified time period, the claim is time-barred and a district court does not have jurisdiction over it. *Butts v. City of New York Dep't of Hous. Preservation and Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993); *Gomes v. Avco Corp.,* 964 F.2d 1330, 1332–33 (2d Cir.1992). Tolling of the limitations period does not occur unless the employee was actively misled by his or her employer, was prevented in some way from exercising his or her rights, or asserted his or her rights in the wrong forum. *Miller v. Int'l Telephone & Telegraph Corp.,* 755 F.2d 20, 24 (2d Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985).

■ Where an employer has engaged in a continuous policy of discrimination, however, acts done in furtherance of that policy are not viewed in isolation, each having its own separate 300–day limitations period. Under this "continuing violation" exception to the Title VII limitations period, if an employee files an EEOC complaint that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims for acts of discrimination pursuant to that policy will be timely, even if they would be untimely standing alone. *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994); *Acha v. Beame,* 570 F.2d 57, 65 (2d Cir.1978). In such circumstances, then, if the EEOC complaint has been filed within three hundred days of the employer's last act in furtherance of its discriminatory policy, the employee may recover for earlier acts of discrimination as well. *Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256, 274 (2d Cir. 1981), *cert. denied sub nom. Bridgeport Firefighters For Merit Employment, Inc. v. Association Against Discrimination in Employment, Inc.,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982).

■ Burrell's EEOC complaint was filed on May 10, 1993, 359 days after the date of the last act of harassment alleged against Roman (Roman's May 15, 1992 memorandum to Burrell criticizing her performance at work), and 342 days after her June 2, 1992 transfer to the Learning Resources Center. The EEOC complaint was filed only 245 days

after Burrell's allegedly retaliatory termination on August 31, 1992, however, well within the 300–day limitations period. Thus, unless Burrell's termination was part of a continuing violation of Title VII, this Court has jurisdiction only over Burrell's claim of retaliatory termination.

To establish a continuing violation, a plaintiff must present proof of specific on-going discriminatory policies or practices, or establish that "specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994). The mere continuation of a single discriminatory act's effects does not amount to a continuing violation, *see United Air Lines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977), nor will discrete, unrelated incidents of discrimination be viewed as part of a continuum. *See Cornwell,* 23 F.3d at 704. The continuing violation exception applies only in cases involving specific, ongoing policies or practices, such as discriminatory seniority lists, *see e.g. Cook v. Pan Am. World Airways, Inc.,* 771 F.2d 635 (2d Cir.1985), *cert. denied,* 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986), or discriminatory employment tests, *see e.g. Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256 (2d Cir.1981). Multiple incidents of discrimination, even similar ones, that are not related to a specific policy or program, do not amount to a continuing violation. *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994).

Considering all of the evidence in the light most favorable to Burrell, a reasonable factfinder could conclude that, from the beginning of her employment with Defendants in January of 1992 until her initial complaint to CUNY's Affirmative Action Office on May 18, 1992, Burrell was subjected to numerous incidents of sexual harassment by Roman. Burrell's claim based on those incidents depends on the theory that, where there is a series of related incidents, one or more of which occurred within the limitations period,

the continuing violation doctrine applies to toll the statute of limitations as to all of them.

The Second Circuit has spoken on this issue, however, and has implicitly rejected Burrell's theory. The incidents alleged by Burrell, although reprehensible if true, do not amount to a specific "policy or practice" as required under *Cornwell v. Robinson,* 23 F.3d 694, 695, 704 (2d Cir.1994). *See also Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993) (holding that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation"); *Butts v. City of New York Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397, 1404 (2d Cir.1993) ("continuous violation exception applies only where discrimination is accomplished through a specific official policy or mechanism"); *Vergara v. Bentsen,* 868 F.Supp. 581, 590 (S.D.N.Y.1994) (Kram, J.) (specifically rejecting the proposition that the continuing violation doctrine applies to a discriminatory policy targeting an individual employee rather than a particular group). While the minimally required characteristics of a "policy or practice" have not been established, the Second Circuit requires something more than a pattern of related actions by one individual directed against another individual over a period of five months. Thus, Burrell's sexual harassment claim is time barred.

### Burrell Has Alleged Facts Sufficient to Make Out a Prima Facie Claim for Retaliatory Discrimination

Title VII provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful practice by this subchapter …" 42 U.S.C. § 2000e–3(a). As the Second Circuit has noted, "[t]he objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. College of Physicians and Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)

A *prima facie* case of retaliation under Title VII requires a showing that (i)

the employee was engaged in an activity protected under Title VII, (ii) the employer was aware of the plaintiff's participation in the protected activity, (iii) the employee suffered adverse employment decisions and (iv) there was a causal connection between the employee's protected activity and the adverse action taken by the employer. *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir. 1993); *Kotcher v. Rosa & Sullivan Appliance Center, Inc.*, 957 F.2d 59 (2d Cir.1992) *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir.1987). The requisite causal connection may be established "if a retaliatory motive played a part in the adverse employment actions, even if it was not the sole cause." *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986).

▮ The plaintiff has the initial burden of proving a *prima facie* case of retaliation by a preponderance of the evidence. If the plaintiff succeeds in proving a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the plaintiff's termination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Malarkey*, 983 F.2d at 1213; *Dominic v. Consolidated Edison Co. of N.Y., Inc.*, 822 F.2d 1249, 1254 (2d Cir.1987). If the defendant carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. at 1825. The plaintiff may succeed in this either directly, by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

The Supreme Court has held that "a reason cannot be proved to be a 'pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (emphasis in original); *see also Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 142 (2d Cir. 1993) ("a Title VII plaintiff does not necessarily meet its burden of persuasion by convincing a factfinder that the employer's non-discriminatory explanation is not creditable; rather, the trier of fact must find that the plaintiff has proven its explanation of discriminatory intent by a fair preponderance of the evidence."), *cert. denied*, —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994).

▮ What this means at the summary judgment stage is that "the plaintiff must establish a genuine issue of material fact either through direct, statistical, *or circumstantial* evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1225 (2d Cir.1994) (emphasis added); *see also Saulpaugh*, 4 F.3d at 142; *Taggart v. Time Inc.*, 924 F.2d 43, 46 (2d Cir.1991). In opposing the motion for summary judgment, Burrell need not prove that CUNY's asserted reasons for her termination are pretextual but, rather, must produce evidence from which a jury could draw an inference of discrimination. *Sorlucco v. New York City Police Dep't*, 888 F.2d 4, 7 (2d Cir.1989).

▮ In the instant action, Burrell has made out a *prima facie* case of discrimination, thus shifting the burden of production onto Defendants. Defendants have met their burden by advancing a legitimate, nondiscriminatory reason for Burrell's termination.[4]

---

4. Paragraph 21 of Nisbett's Declaration reads: "I did not discuss [Burrell's termination] with Dean Roman or anyone else at Sophie Davis. Although at some point I learned, through my membership on the City College Affirmative Action Committee, that [Burrell] had filed a complaint against Dean Roman, I do not recall when I gained that knowledge. In any event, even assuming that I learned of the complaint prior to reaching my decision concerning [Burrell's] continued employment at [CUNY], that knowledge played no part in my decision. The decision was based solely on the fact that [Burrell's employment] had been unlawful since the day she was hired, and that for more than two months [Burrell] had rebuffed all requests to provide the

Consequently, the burden is on Burrell to produce evidence from which a jury could infer that Defendants' proffered reason is pretextual. Bearing in mind that "the shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff [has her] day in court despite the unavailability of direct evidence," *Sorlucco,* 888 F.2d 4, 7, *quoting Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985), Burrell has presented evidence which would support an inference that she was terminated in retaliation either for making her initial complaint to CUNY's Affirmative Action Office or for refusing to accede to Roman's sexual advances. Specifically, Burrell submits a photocopy of Chin's June 25, 1992 letter calling attention to Burrell's ineligibility to work at CUNY, copies of which were sent to Roman and Nisbett, CUNY's Director of Personnel. In addition, she submits a copy of Roman's August 4, 1992 letter to Nisbett, in which Roman asserts that Burrell misrepresented her eligibility to work for CUNY at the time of her second interview with Roman.

Without these letters from Chin and Roman—both alleged participants in Burrell's harassment—it is unlikely that Nisbett would have terminated Burrell, for Nisbett admits: "At the time I received my copy of [Chin's] June 25 letter, I did not know what an H-1 petition was." In light of the permissible inferences created by Roman's and Chin's letters to Nisbett, therefore, Nisbett's independent justification for firing Burrell, even if genuine, is not sufficient. From the evidence currently before the Court, a reasonable factfinder could find either (i) that Roman used the Personnel Office as his unwitting instrumentality in effecting Burrell's termination or (ii) that Nisbett's proffered explanation for Burrell's termination is "unworthy of credence." *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1980). Either finding would indicate that the predominant reason for Burrell's termination was in retaliation either for filing her complaint with CUNY's Affirmative Action Office

or for refusing to accede to Roman's sexual advances, both activities protected under Title VII.

### Conclusion

For all the reasons stated above, Defendants' motion for summary judgment on Burrell's sexual harassment claim is granted. Defendants' motion for summary judgment on Burrell's claim for retaliatory termination is denied.

It is so ordered.

necessary information and documentation to show that [CUNY] could lawfully retain her as an

employee."