**CORRESPONDENT SERVICES CORPORATION, Interpleader–Plaintiff,**

v.

**J.V.W. INVESTMENTS LTD., First Equities Corporation of Florida, J.V. Waggoner, and Donal Kelleher, Interpleader–Defendants,**

and

**Suisse Security Bank And Trust, Ltd., Additional Defendant on the Cross–Claims.**

**No 99 CIV 8934 RWS.**

United States District Court, S.D. New York.

Nov. 26, 2001.

Drinker Biddle & Reath by Brian F. McDonough, New York City, for Interpleader–Plaintiff.

Shaw Pittman by Kenneth Caruso, Jeffrey I. Wasserman, New York City, for Interpleader–Defendants J. Virgil Waggoner and J.V.W. Investment, Ltd.

Richardson Mahon Casey & Rooney by James J. Mahon, New York City, for Interpleader–Defendant Donal Kelleher.

Kronish Lieb Weiner & Hellman by William J. Schwartz, New York City, for Additional Defendant on the Cross–Claims.

Milbank Tweed Hadley & McCloy by Andrew E. Tomback, New York City, for Cross–Claim Defendant.

## OPINION

SWEET, District Judge.

Defendant J. Virgil Waggoner ("Waggoner") has moved, pursuant to Rule 56(b), Fed.R.Civ.P., for summary judgment on two cross-claims brought by defendant Donal Kelleher ("Kelleher"). Kelleher, in opposing this motion, has cross-moved to compel further discovery and allow letters rogatory. For the reasons set forth below, Waggoner's motion is denied as to the first cross-claim and granted as to the second. Kelleher's cross-motion is granted in part and denied in part.

### The Parties

Interpleader-plaintiff Correspondent Services Corporation ("CSC") is a Delaware corporation with its principal place of business in New York, New York.

Defendant J.V.W. Investment Ltd. ("JVW") is a corporation formed under the laws of the Commonwealth of Dominica ("Dominica") with its principal place of business in Dominica.

Defendant Kelleher is a foreign national and a resident of Surrey, England.

Defendant Waggoner is a United States citizen domiciled in Texas.

Third–Party defendant Suisse Security Bank and Trust, Ltd. ("SSBT"), is a Bahamian corporation with its principal place of business in the Bahamas.

### Prior Proceedings

On August 18, 2000, this Court issued an opinion dismissing three of four counterclaims filed by Kelleher against Waggoner. *Correspondent Services Corp. v. J.V.W. Investments, Ltd.*, 120 F.Supp.2d 401 (S.D.N.Y.2000). Kelleher's Fourth Counterclaim for breach of fiduciary duty was not dismissed, nor were Waggoner's cross-claims against Kelleher for breach of con-

tract, breach of fiduciary duty, conversion, and interference. *Id.*

In September 2000, Waggoner and JVW sought and obtained leave to amend their pleadings to add SSBT as a third-party defendant and to assert cross-claims against Kelleher and SSBT. Kelleher answered the amended pleadings on November 27, 2000, and alleged two cross-claims against Waggoner, one for breach of contract and the other for breach of fiduciary duty.

On March 30, 2001, Waggoner filed the instant motion for summary judgment to dismiss Kelleher's two cross-claims. Kelleher cross-moved for discovery and the issuance of letters rogatory. The motions were argued on July 25, 2001, and deemed submitted at that time.

### Facts

The factual background of this action has been set forth in the prior opinions of this Court, familiarity with which is assumed, and will only partly be repeated here. *See Correspondent Services Corp. v. J.V.W. Investments Ltd.*, 47 F.R.D. 204 (S.D.N.Y.2001) ("*JVW III*"); *Correspondent Services Corp. v. J.V.W. Investments, Ltd.*, 120 F.Supp.2d 401 (S.D.N.Y.2000) ("*JVW II*"); *Correspondent Services Corp. v. J.V.W. Investment, Ltd.*, No. 99 Civ. 8934, 2000 WL 1174980 (S.D.N.Y. Aug. 18, 2000) ("*JVW I*"). Unless it is explicitly noted, the following facts are not explicitly controverted by the parties.

The relationship between Kelleher and Waggoner dates back to at least November 1997, when the two entered into an arrangement in which Kelleher was to introduce Waggoner to certain contacts of his who were involved in international high-yield investment programs. Waggoner agreed to pay a percentage of the profits he earned by investing his funds in such programs in return for Kelleher's help in locating, arranging, and helping to manage those investments.

In the months following November 1997, Kelleher introduced Waggoner to a variety of investment opportunities. One such deal involved Ufinco, Ltd. ("Ufinco"). On December 1, 1997, Waggoner signed a Joint Participation Agreement ("Ufinco JPA") that appointed Ufinco as his investment manager to invest the sum of $10 million. By its specific terms, the contract could not be orally modified. Later, on December 5, 1997, Ufinco notified Waggoner that Kelleher was appointed trustee for the funds under that agreement. Waggoner agreed to this arrangement. However, an investment was never made through Ufinco, as Waggoner decided not pursue this arrangement.

In December 1997, Kelleher introduced Waggoner to Bower Cotton, a firm of London solicitors, who in turn introduced Waggoner to Nikea, N.V. ("Nikea"), an investment firm operating out of Bower Cotton's offices. Waggoner thereafter wired $10 million to Bower Cotton to be held in escrow for use in investment programs to be arranged through Nikea. The correspondence between Waggoner and Kelleher indicated that their relationship with Bower Cotton and Nikea would be governed by the Ufinco JPA.

Kelleher claims that in or around January 1998 the parties formed a joint venture (the "Joint Venture") in which Waggoner would invest substantial funds in programs that Kelleher located, and Kelleher would receive 20% to 30% of the profits. Waggoner denies that the Joint Venture was ever formed. No document has been submitted to substantiate Kelleher's claim. On January 23, 1998, Waggoner signed a document (the "January 23 Trustee Appointment") that appointed Kelleher as Waggoner's trustee for purposes of coordi-

nating Waggoner's funds held in escrow at Bower Cotton into a high yield private placement program, and to manage the funds in accordance with instructions in an accompanying letter to Bower Cotton. However, neither the January 23, 1998 Trustee Appointment nor the January 23, 1998 letter makes any mention of, or provides evidence of, the alleged Joint Venture.

In April 1998, Kelleher and Waggoner entered into a Joint Participation Agreement (the "JPA") for purposes of another investment arrangement. Kelleher had located an investment program managed by Mintus, Inc. ("Mintus") that would maintain funds at and conduct trading through Citibank, N.A. ("Citibank") in New York. Pursuant to the JPA, Kelleher and his company, Abbeyfield Asset Management, SA, would serve as trustee for Waggoner and invest $10 million, belonging to Waggoner, in a high-yield investment program administered by Citibank. Within the limits set by the JPA, Kelleher was given " full power of substitution" to act on behalf of Waggoner; however, Kelleher was "never authorized or empowered to remove [Waggoner]'s funds" from Waggoner's bank account.

In return for his services, the JPA section on fees and distribution of returns provided that Kelleher was to receive a share of profits earned from the high yield program, ranging from 20% to 25%. The same section contained a non-circumvention clause, which provided that "[b]oth parties agree to observe the customary rules and regulations of non-circumvention and nondisclosure" and stipulated that Waggoner "acknowledges the specific value of [Kelleher]'s contacts and the value of total confidentiality pertaining to this contract and the private placement process." The JPA, governed by New York law, provided that any changes to the agree-

ment must be made in writing and agreed to by the parties, and that verbal agreements would have no binding effect.

Incorporated within the JPA was an Exhibit C titled "Appointment of Trustee." Pursuant to that document, Waggoner appointed Abbeyfield, represented by Kelleher, as trustee for the following specific and limited purpose only:

1. To coordinate placement of my funds, currently held in my escrow account at National Westminister Bank, number 01339044, RE: J. Virgil Waggoner, into a high yield private placement program whose bank has assigned me a transaction subaccount number. To manage this transaction account at all times as a non-declining balance (non-depletion) account. And never to reduce or deplete the cash or cash-equivalent balance in this account designated in the name of and under the sole ownership of J. Virgil Waggoner.

2. Within the guidelines of my written instructions as above, to execute on behalf of myself, J. Virgil Waggoner, all documents reasonably required from any institution in order to carry out the intent and requirements of the private placement program and to manage its implementation and daily operations.

3. Within the constraints as noted above, to give and to grant to the Trustee the same authority to act as if said act were performed by Mr. Waggoner.

Waggoner would eventually decide not to invest in the Mintus program. In June 1998, Kelleher located yet another program, in which Waggoner's funds were to be maintained, and the trading conducted, by Gert von Wippel. To facilitate entry into the program, Waggoner and Kelleher formed an Addendum to the JPA, changing the specified bank from Citibank to "Barclay's or Midland or similar quality U.K. clearing bank." However, no invest-

ment was ever made in the von Wippel program.

Kelleher later located an investment program managed by British Trade and Commerce Bank ("BTCB"), a bank organized under the laws of Dominica. As this Court noted in a prior opinion, the parties' correspondence demonstrates that the JPA applied to the BTCB transaction and that the parties were operating under the JPA with respect to the BTCB investment. *See JVW I,* 2000 WL 1174980, at *3 n. 3, *20. In June 1998, a company called J.V.W. Investment Ltd. ("JVW") was organized under the laws of Dominica to serve as the vehicle through which Waggoner's funds would be invested. Waggoner owned 100% of JVW's shares, and Kelleher was appointed as Director of JVW.

On June 25, 1998, Kelleher, as Director of JVW, entered into a contract called the Cooperative Venture Agreement ("CVA") with BTCB. The CVA provided that (a) JVW would deposit $10 million into a "Custody/Transaction Account at BTCB," (b) BTCB would issue a certificate of deposit ("CD") in JVW's name, (c) the CD would have a term of one year and bear interest at 6% per annum, and (d) BTCB would place the $10 million into investments to provide a "significant yield" on a best efforts basis over the course of one year.

According to Waggoner, Kelleher instructed him to arrange for his London solicitors to wire his $10 million to SSBT in the Bahamas. BTCB had purportedly instructed Kelleher to place the $10 million into a BTCB sub-account in the name of JVW at SSBT. Pursuant to the CVA, BTCB would then place the $10 million into the investment program and issue the CD to JVW. However, Waggoner claims Kelleher arranged the transfer of the $10 million into a freestanding account at SSBT rather than the designated BTCB sub-account. On or about June 26, 1998, Kelleher allegedly represented that the $10 million was available for immediate investment, and that it would be immediately transferred into the designated BTCB sub-account at SSBT. BTCB then issued the CD to JVW in the face value amount of $10 million. However, SSBT refused to transfer the $10 million from the freestanding account to the BTCB sub-account. As a result, Waggoner claims he did not gain entry into the Investment Program.

When inquiries were made as to why the $10 million had not been transferred into the BTCB sub-account, SSBT stated that it had been concerned about the origin of Waggoner's money. When this concern was shown to be without basis, SSBT stated that it had placed the $10 million into Alliance Capital Management ("ACM") mutual funds and had done so at Kelleher's direction through certain letters of instruction. However, this Court has already noted that these letters of instruction are of questionable authenticity and provide little basis for concluding that Kelleher authorized the purchase of ACM mutual funds. *See JVW II,* 120 F.Supp.2d at 406.

According to Kelleher, he did not have the authority to remove Waggoner's funds from the National Westminister escrow account Waggoner set up at Bower Cotton, and Waggoner had full control of the funds deposited in that account. Kelleher alleges that BTCB originally suggested that the funds be transferred into its numbered sub-account within SSBT's account at Citibank, but specifically proposed that no reference be made to JVW. Ostensibly concerned with an exchange that lacked identifying data, Kelleher has alleged that he advised Waggoner and his agent and advisor, Lisa Duperier, that a new sub-account should be established in the name of

JVW, and that the funds be transferred into and held in that account until they could be exchanged for the CD issued by BTCB.[1] Kelleher swears that BTCB assisted in and arranged for the JVW subaccount at SSBT. It is undisputed that on June 16, 1998, Waggoner wrote a letter to Bower Cotton directing the firm to transfer his funds to the account at SSBT in the name of JVW.

In September 1998, SSBT transferred ACM mutual funds to BTCB or, Kelleher claims, a Bank of New York account apparently for BTCB's benefit. When liquidated, those funds yielded proceeds of $2,339,239. Later, SSBT transferred, in several stages, additional ACM mutual funds that, when liquidated, yielded proceeds of $5,384,492.55, according to Waggoner. These sums, totaling $7,723,731.55, were the total finally made available by SSBT and were used to fund the CD.[2] Although the CD has a printed face value of amount of $10 million, it states on its face, "Deposits made in any form shall not be considered good until the same have been cleared." According to Waggoner, the CD was therefore only good to the extent of $7,723,731.55, leaving a shortfall of $2,276,268.45 from Waggoner's $10 million deposit at SSBT.

Kelleher disputes the conclusion that only approximately $7.7 million was received by Waggoner, principally for two reasons. First, in September 1998, at the request of CSC, BTCB substituted a $10 million CD in bearer form for that issued in the name of JVW. This, Kelleher argues, represented to the world at large (including Waggoner) that the CD should be valued at the full face amount of $10 million. Second, Kelleher's affidavits, reporting the results of Senate staff report entitled *Investigations Report on Correspondent Banking: A Gateway to Money Laundering* ("Senate Investigations Report"), allege that a total of $10 million in transfers occurred in October 1998 from SSBT to attorney escrow accounts controlled by BTCB. According to Kelleher, some of those funds passed through the escrow account of attorney Robert Garner, counsel to First Equity, and all of the funds were eventually deposited into another attorney's escrow account, held by a solicitor named Robert McKellar at the Union Bank of Switzerland. In March 1999, $6 million was allegedly transferred from that Swiss escrow account to BTCB, which was then distributed by BTCB to its own accounts and other parties, not including JVW and Waggoner.

On November 10, 1998, after consulting with BTCB the previous week, Waggoner wrote a letter to Kelleher terminating the JPA due to Kelleher's alleged deceptions and breaches of the JPA. On the same date, Waggoner transferred all the shares of JVW to Wagonwheel Trust. On November 11, 1998, Wagonwheel Trust, sole shareholder of JVW, resolved formally to remove Kelleher as a director of JVW, and

---

1. Kelleher simultaneously asserts that there may not have even been a "sub-account" in JVW's name or in BTCB's name at SSBT's account in Citibank. Rather, he claims the funds wired to SSBT's account at Citibank were commingled and treated as SSBT's property. JVW's $10 million was received by Citibank, and then transferred not to the Bahamas but to the New York brokerage firm of Tucker Anthony, at a general account owned by SSBT. Thus, he claims, the Citibank account and the Tucker Anthony account were both general accounts treated by SSBT as such.

2. Kelleher now disputes this amount and claims that between October 4, 1998 and October 12, 1998, securities in the amount of $5,6000,260.50 were transferred from SSBT to BTCB, making the total $7,939,500.13. For purposes of this motion, this discrepancy is not material.

so informed Kelleher by letter and fax. BTCB officers were named to take the place of Kelleher. Thereafter, BTCB refused to take instructions from Kelleher since only Waggoner had interest in the assets and affairs of JVW.

In June 1999, the $10 million CD matured, and Kelleher claimed part of the funds, leading the clearing agent, CSC, to file an interpleader action. On August 16, 2000, this Court held that Kelleher had no ownership interest in the CD, but refused to dismiss his claims for damages against Waggoner for Breach of Fiduciary Duty.

### Discussion

#### Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Generally, "all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330, n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Burrell v. City Univ.*, 894 F.Supp. 750, 757–58 (S.D.N.Y.1995) (citing cases). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995).

However, the moving party does not bear the burden of proving that the nonmovant's case is wholly frivolous. *See Brady*, 863 F.2d at 210 (*citing Celotex*, 477 U.S. at 323–26, 106 S.Ct. 2548). Rather, "in cases where the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim. Thus, the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady*, 863 F.2d at 210–11. If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell*, 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

#### Material Issues of Fact Preclude a Determination of Whether Waggoner Breached the JPA

Kelleher claims that Waggoner breached the JPA by entering into an agreement with BTCB that resulted in the removal of Kelleher on November 11, 1998 as director and trustee of JVW. Specifically, Kelleher alleges that Waggoner violated the terms of the JPA's non-circumvention clause, which states that "[b]oth parties agree to observe the customary rules and regulations of non-circumvention and nondisclosure, and to act in good faith and with integrity." That clause further stipulates that Waggoner "acknowledges the specific value of [Kelleher]'s contacts and the value of total confidentiality pertaining to [the JPA] and the private placement process."

In moving for summary judgment, Waggoner argues that he did not breach the non-circumvention clause, but rather justifiably cancelled the contract in his November 10, 1998 letter after Kelleher materially breached the terms of the JPA. He claims that Kelleher was contractually bound by the JPA to "cause the invest-

ment" of the $10 million, and, as trustee, was responsible for "coordinat[ing] placement" of Waggoner's money. Thus, when Kelleher failed to place Waggoner's $10 million into the Investment Program administered by BTCB, Waggoner claims he was discharged from performing his own obligations under the JPA.

While it is true that when one party commits a material breach the other party may in some circumstances be discharged from performance, *see Jafari v. Wally Findlay Galleries*, 741 F.Supp. 64, 68 (S.D.N.Y.1990) (*citing Merritt Hill Vineyards, Inc., v. Windy Heights Vineyard, Inc.* 61 N.Y.2d 106, 460 N.E.2d 1077, 1081, 472 N.Y.S.2d 592, 596 (1984)); Restatement (Second) of Contracts § 241, in order for summary judgment to be proper, it must be clear at the outset that there are no genuine issues of material fact as to the cause of the breach and whether it rose to the appropriate level of materiality to justify termination of the contract.

■ Here, the record demonstrates that a genuine issue of material fact exists as to whether Kelleher committed a material breach of the JPA, thereby giving rise to Waggoner's termination of the contract. Waggoner insists that Kelleher prevented him from entering the Investment Program when Kelleher transferred, or directed Waggoner to transfer, the $10 million into a freestanding account rather than the designated BTCB sub-account at SSBT. Kelleher, however, swears that it was Waggoner, not Kelleher, who controlled the funds deposited in the escrow account at Bower Cotton and who oversaw the transfer of the money to the alternative

account. Moreover, Kelleher's version of the facts point out that BTCB assisted in and arranged for the establishment of the JVW sub-account. Granting Kelleher, the non-moving party, the benefit of all inferences to be drawn from the record, it is not overwhelmingly clear at this stage that Kelleher was responsible for the alleged shortfall.[3]

Waggoner argues in the alternative that he could not have breached the non-circumvention clause because he received no profits from the BTCB transaction. He claims that the non-circumvention clause protects the "specific value of [Kelleher's] contacts" and only contemplates profits actually received, namely 20% of the amount earned. Waggoner then points to the statements of Price Waterhouse Coopers, the Court-appointed receiver and liquidator for BTCB, which conclude that the high-yield trading activities of BTCB "did not generate any revenues over the life of the bank ...." (Rooney Aff. Ex. 5). Because there are no damages to be had, he concludes, circumvention is not at issue and summary judgment is appropriate. *Cf. Am. Home Prods. v. CAMBR Co., Inc.*, No. 00 Civ. 2021, 2001 WL 79903, at *4 (S.D.N.Y. Jan. 30, 2001) (under New York law, plaintiff must establish, *inter alia*, "damages suffered as a result of the breach").

Waggoner's argument is controverted by Kelleher. As Kelleher points out, the Senate Investigations Report released early this year reveals that a total of $10 million was transferred in October 1998 from SSBT to attorney escrow accounts controlled by BTCB, a portion of which

---

**3.** While Waggoner points out in his reply brief that his reasons for cancelling of the JPA were not limited to the movement and placement of the $10 million, and included reasons such as Kelleher's purported misrepresentation that the investment conformed to the JPA terms, these alleged deceptions and breaches of the JPA are all denied by Kelleher and, to the extent that they do not relate to the movement of the $10 million, are uncorroborated by Waggoner.

has been traced to the account of Robert McKellar of the Union Bank of Switzerland. In March 1999, the sum of $6 million was disbursed from McKellar's account to BTCB, which used the money to pay its own obligations. While none of those distributions from BTCB have been traced to Waggoner, the Senate Investigations Report has at least raised questions as to the revenues received by BTCB and the movement of Waggoner's money. Taken together with the fact that Waggoner continued to do business with BTCB after allegedly losing $2.3 million from his transactions with that bank, it is not overwhelmingly clear at this stage that Waggoner did not receive any profits from the BTCB transaction or, at the least, have independent arrangements with BTCB prior to November 10, 1998.

In sum, viewing the record in the light most favorable to Kelleher, the Court cannot find that the record as a whole could not lead a rational juror to conclude that Waggoner breached the JPA.

### There Was No Joint Venture and Therefore No Breach of Any Fiduciary Duty Arising from the Joint Venture

Waggoner also seeks summary judgment on Kelleher's claim that Waggoner breached a fiduciary duty owed to Kelleher as part of the alleged Joint Venture between the two. According to Kelleher, the Joint Venture was formed in or around January 1998 when Kelleher agreed to invest Waggoner's funds in programs that Kelleher located, in return for 20–30% of profits produced by the investments. Kelleher claims that the Joint Venture gave rise to a fiduciary duty that obligated both parties to act in good faith and deal fairly with one another. The duty was allegedly breached when Waggoner appropriated for himself Kelleher's business contacts and special expertise and attempted to reach separate agreements with the managers of the programs that were introduced to him by Kelleher. Waggoner argues that no joint venture ever existed, and swears that he never attempted to make, and never made, any agreements or investments with anyone introduced to him by Kelleher, except BTCB.

■ In order to determine whether the parties to have entered into a joint venture, courts generally look to the following five elements, all of which must be present: (1) a specific agreement to establish an enterprise for profit; (2) the parties' mutual intent to be joint venturers; (3) their mutual contribution of property, financing, skill, knowledge or effort; (4) joint management or control over the venture; and (5) a provision for the sharing of both profits and losses. *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* 909 F.2d 698, 701 (2d Cir.1990); *see also All American Adjusters v. Acceleration Nat. Ins. Co.,* 1997 WL 732445, at *6 (S.D.N.Y. Nov. 25, 1997); *Tilden of New Jersey, Inc. v. Regency Leasing Sys., Inc.,* 230 A.D.2d 784, 785–86, 646 N.Y.S.2d 700, 701 (2d Dep't 1996).

■ Kelleher claims that he and Waggoner formed the Joint Venture in or around January 1998. However, he provides no evidence of any of the factors listed. To the extent that there is any evidence of a specific oral or written agreement, or any intent to form such an agreement, Kelleher points only to a January 23, 1998 letter from Waggoner to Bower Cotton that makes reference to the January 23, 1998 Trustee Appointment. According to Kelleher, the letter was written in accordance with the alleged Joint Venture. But neither of these documents makes any reference to the alleged Joint Venture. Nor does either document mention any profits (or losses) to be shared in the manner that Kelleher suggests.

Any inference to be made regarding the formation of a joint venture is also belied by the overwhelming evidence that Kelleher and Waggoner intended their arrangements to be governed by contract. It is undisputed that on December 1, 1997, Waggoner signed the Ufinco JPA governing the investment arrangement with Ufinco. By its terms, that agreement could not be orally modified and made no reference to the creation of a Joint Venture. Subsequent correspondence, as submitted to this Court, demonstrates that in the months that followed, Waggoner and Kelleher (as Ufinco trustee) understood the Ufinco JPA to govern the parties' relationship with Bower Cotton and Nikea. (Caruso Reply Aff. Exs. K, L, M). As for any deals with Mintus and Gert Von Wippel, it is undisputed that the JPA signed on April 14, 1998, which also could not be orally modified, covered transactions with the former and that the June 1998 Addendum covered transactions with the latter. Finally, as this Court has already noted, the BTCB transaction was also covered by the April 14, 1998 JPA. *See JVW I,* 2000 WL 1174980, at *21.

In sum, the record clearly shows that no oral joint venture was created between Kelleher and Waggoner and that, if it was, it was negated by written contracts that precluded any oral alterations. There being no joint venture and, hence, no related fiduciary duty, Waggoner is entitled to summary judgment.

### Further Discovery is Warranted

In his cross-motion, Kelleher argues that additional discovery is required before granting summary judgment on the breach of contract and breach of fiduciary duty claims. To this end, Kelleher has filed a cross-motion (1) seeking to compel Waggoner to comply with discovery notices that have been served upon him, (2) granting Letters Rogatory to depose certain non-party witnesses who are in foreign countries, and (3) permitting Kelleher to obtain documents from and/or depose various other non-parties.

Kelleher does not identify with specificity the documents in Waggoner's possession to which he desires access, but lists the following factual categories: (a) the formation of the joint venture; (b) the various investment programs that Kelleher found and proposed to him; (c) the initial contacts with BTCB, the formation of JVW, the transfer of the funds from Bower Cotton and the subsequent attempts to recover the funds from SSBT; (d) meetings attended by Kenneth Caruso, Waggoner's counsel, in the Bahamas in late October 1998 and the agreements that were made there; (e) the creation of Wagonwheel Trust, the purported transfer of JVW's stock to that entity, and what Wagonwheel did with JVW's assets; and (f) the nature, extent and result of Waggoner's subsequent dealings with BTCB, including but not limited to Overseas Projects Co. In addition, Kelleher seeks Waggoner's foreign trust income tax schedules.

It is the understanding of this Court, as presented by Waggoner, that all JVW documents pertaining to categories (b), (c), and (e) have been produced. As for the existence of a joint venture, this Court has found that no such venture exists. Thus, no further discovery is required on this matter. Kelleher's remaining requests, regarding Caruso's meetings in the Bahamas and Waggoner's tax schedules, are also denied.

Kelleher's remaining requests are granted, including: (a) the deposition of Charles Brazie and George Betts, both former or present officers of BTCB; (b) the deposition of Robert Garner and Robert McKellar, the attorney and solicitor into whose accounts the funds that were transferred from SSBT to BTCB were deposited; and

(c) the deposition of the Receiver of BTCB and/or the Receiver of SSBT.

*Conclusion*

For the reasons set forth above, Waggoner's motion for summary judgment is granted as to Kelleher's amended cross-claim alleging breach of fiduciary duty. Waggoner's motion is denied as to Kelleher's cross-claim alleging breach of the JPA, leaving this as Kelleher's only surviving claim against Waggoner in this action. Kelleher's cross-motion to compel further discovery and allow letters rogatory is granted as to the depositions of Charles Brazie, George Betts, Robert Garner, and Robert McKellar, and the Receiver of BTCB and/or the Receiver of SSBT. Kelleher's discovery requests are denied in all other respects.

It is so ordered.