*229 OPINION OF THE COURT
Edward H. Lehner, J.
Before me is a motion by defendant to set aside the jury verdict against him and a cross motion by plaintiff to vacate the jury finding that she impliedly assumed a risk of injury to herself when she agreed to undergo treatment by defendant.
In 1991, after being diagnosed with uterine cancer, plaintiff underwent a hysterectomy at Mt. Sinai Hospital, subsequent to which the physicians at that hospital recommended a course of radiation and chemotherapy. That protocol, considering plaintiff’s condition, was variously described as "investigative” or "experimental”, and was apparently recommended due to the fact that plaintiff had a high chance of recurrence because her cancer cells were found to be poorly differentiated.
Plaintiff then, in seeking a "second opinion”, arranged an appointment with defendant in October 1991. She testified that he dissuaded her from having chemotherapy or radiation, and recommended treatment through his protocol of a special diet, including six coffee enemas a day. A tape of the conversation between the parties shows that he advised her not to "mess” with chemotherapy and stated that he had experienced a 75% success rate with persons in her condition. He also informed her that, through a hair test he had devised, he had determined that cancer cells remained in her body, which condition was undetected by the Mt. Sinai physicians. Plaintiff, who knew of defendant through attendance at one of his lectures and listening to his tapes, and who had witnessed the severe discomfort experienced by a relative who had undertaken chemotherapy and radiation, agreed to be treated by defendant and until June 1992 religiously followed his protocol. Plaintiff was encouraged to continue the treatment when defendant advised her that subsequent hair tests showed a reduction in the number of cancer cells in her body. She testified that she was never told by defendant that he was not an oncologist, nor that his protocol was experimental and not generally accepted in the medical community.
In June 1992, after experiencing back discomfort and failing vision, she discontinued treatment with defendant and returned to Mt. Sinai Hospital where it was determined that cancer cells had metastasized in her spine, which condition eventually caused her blindness and severe back problems.
In this action plaintiff asserted damage claims against defendant (i) in negligence for persuading her to forego traditional *230 treatment and undertaking a nutritional protocol which she contends, by itself, was of no therapeutic value, and (ii) for lack of obtaining an informed consent to the treatment. In addition, she sought punitive damages.
At trial the jury unanimously determined: that the treatment provided by defendant was a departure from good and accepted medical practice, which departure was a proximate cause of injuries to plaintiff; that defendant did not provide plaintiff with appropriate information with respect to the risks of his treatment and the alternatives thereto, and that a reasonably prudent person in plaintiff’s position would not have agreed to have the treatment if provided the appropriate information; that by accepting treatment by defendant, plaintiff did not expressly assume risk of injury to herself, but did impliedly assume such risk; that defendant was 51% responsible for plaintiff’s injuries, while plaintiff was 49% responsible; that plaintiff was entitled to damages for pain and suffering sustained prior to verdict of $2,500,000 and $2,000,000 for future suffering, as well $125,000 for past loss of earnings and $75,000 for future loss of earnings; and finally that plaintiff was entitled to punitive damages. At the separate punitive damages aspect of the trial, the jury awarded plaintiff an additional $150,000.
Defendant argues that if the verdict is sustained he will not be able to practice and this will send a chill to all alternative medicine practitioners. He notes that in 1994 the State Legislature recognized the work of nonconventional physicians when in chapter 558 of the Laws of 1994 it amended Education Law § 6527 by adding paragraph (e) to subdivision (4) to specifically provide that the law does not prevent a "physician’s use of whatever medical care, conventional or non-conventional, which effectively treats human disease, pain, injury, deformity or physical condition”, and that subdivision (1) of section 230 of the Public Health Law was amended to provide that no less than 2 of the 18 members of the Board for Professional Medical Conduct "shall be physicians who dedicate a significant portion of their practice to the use of non-conventional medical treatments”.
During the course of the trial, a telecast of a two-hour lecture by one of the more famous practitioners of alternative medicine, Dr. Andrew Weil, was broadcast on public television, during which he indicated that the use of chemotherapy and radiation for the treatment of cancer will be a thing of the past. At the request of plaintiff’s counsel, the court inquired *231 whether any of the jurors had seen the telecast and, when it was indicated that none had seen the program, instructed them not to view its rebroadcast. In his 1995 "number one” bestseller, Spontaneous Healing, Dr. Weil wrote (at 268-276):
"Current therapies for cancer, both conventional and alternative, are far from satisfactory. Conventional medicine has three main treatments: surgery, radiation, and chemotherapy, of which only the first makes sense * * *
"Radiation and chemotherapy are crude treatments that will be obsolete before long * * * If you have cancer and are faced with a decision about whether to use conventional therapies, the question you must try to answer is this: Will the damage done to the cancer justify the damage done to the immune system? * * *
"Cancer treatments abound in the world of alternative medicine, most of them much less toxic than radiation and chemotherapy, but none of them works reliably for large numbers of patients. Many of the therapies I have looked into appear to have induced remissions in some people; in many more they improve quality of life for a time, yet the cancers remain and continue to grow * * *
"New and better cancer treatment is on the horizon in the form of immunotherapy, methods that will take advantage of natural healing mechanisms to recognize and destroy malignant cells without harming normal ones. In the meantime, a concerted effort to discover and study cases of spontaneous remission may help us understand that phenomenon and increase its incidence. To make wise decisions regarding the use of existing therapies for cancer, you must have reliable information about their benefits and risks.”
In the May 12, 1997 issue of Time Magazine, which had a photograph of Dr. Weil on the cover with the subtitle: "Is it sound advice or snake oil?”, a former editor of the New England Journal of Medicine is quoted as saying of Dr. Weil (at 75): "I resent well-educated people exploiting irrational elements in our culture, and that’s what he’s doing.” The reporters in the article conclude (at 75): "The debate between alternative and mainstream medicine will not get settled anytime soon * * * [What is not] clear — at least for now — is whether Weil and other alternative healers are selling real cures or * * * just casting good spells.”
While there may be a public debate as to the merits of certain practices of nonconventional physicians, there was no *232 similar debate with respect to the evidence at this trial. The standard for proving negligence in a malpractice case is whether the treatment deviates from accepted medical standards (Jackson v Presbyterian Hosp., 227 AD2d 236 [1st Dept 1996]). There was no testimony on behalf of defendant on this issue. Moreover, it would seem that no practitioner of alternative medicine could prevail on such a question as the reference to the term "non-conventional” may well necessitate a finding that the doctor who practices such medicine deviates from "accepted” medical standards. This indeed creates a problem for such physicians which perhaps can only be solved by having the patient execute a comprehensive consent containing appropriate information as to the risks involved. In this connection, in Schneider v Revici (817 F2d 987 [2d Cir 1987]), where although the court stated that "an informed decision to avoid surgery and conventional chemotherapy is within the patient’s right”, and there is "no reason why a patient should not be allowed to make an informed decision to go outside currently approved medical methods in search for an unconventional treatment”, it declined to enforce the covenant not to sue executed by the patient, but said it was appropriate for the jury to determine whether the language of the form she signed and "testimony relating to specific consent informed by her awareness of the risk of refusing conventional treatment” amounted to an express assumption of risk that would totally bar recovery (at 995-996). In Boyle v Revici (961 F2d 1060 [2d Cir 1992] [a case involving the same nonconventional physician as in Schneider, supra]), the court ruled that even without a written consent the jury should, based on the evidence, have been permitted to determine whether plaintiff "knowingly accepted all of the risks of a defendant’s negligence” (at 1063), and thus expressly assumed the risk of injury to herself.
On the issue of proximate cause, while there was conflicting evidence, the jury was entitled to find, in accordance with the testimony of plaintiff’s expert (Dr. Holland), that if plaintiff were not improperly dissuaded from undertaking conventional treatment the cancer probably would not have metastasized and she would not have had the recurrence and the resulting blindness and back problems. Plaintiff’s experts also testified that the hair test employed by defendant to ascertain the presence of cancer was completely bogus, the treatment provided by him was of no value, and (in addition to being damaging in the sense that plaintiff was persuaded not to undergo conventional treatment) was harmful in that the nutrition provided aided the growth of the cancer cells.
*233 Thus, the jury’s findings on the questions of negligence and proximate cause cannot be said to be against the weight of the evidence or lacking a rational basis. The same can be said about its findings on the cause of action for lack of informed consent as there clearly was evidence to support the conclusion that defendant did not provide "appropriate information” with respect to the risks of, and the alternatives to, employing his protocol alone and not combining it with conventional treatment.
On the question of assumption of risk, the jury was asked both whether plaintiff expressly assumed the risk of injury to herself in agreeing to defendant’s protocol (a finding of which would have exonerated defendant), and whether she impliedly assumed a risk of injury (a finding of which would, and did, bring into play the comparative fault provisions of CPLR article 14-A). (See, Arbegast v Board of Educ., 65 NY2d 161 [1985]).
With respect to the jury determination that plaintiff "impliedly” assumed risk of injury to herself in agreeing to undergo the treatment, plaintiff’s counsel states that the question thus posed is "whether or not plaintiff had knowledge and a full understanding of the risks of harm of defendant’s proposed treatment from a source other than defendant himself’ (plaintiff’s mem of law, at 7). Counsel argues that she did not. However, the evidence showed that plaintiff was a well-educated person who, together with her husband and daughter, did a significant amount of investigation regarding the treatment being offered by defendant and hence became quite knowledgeable on the subject, and that she sought to avoid the suffering that accompanied the chemotherapy/ radiation regimen that she had witnessed when a relative had undertaken that treatment. Thus, even though the jury found that defendant had not given appropriate information regarding the risks of his procedure and the available alternatives, it was within the province of the jury, based on the evidence, for it to also find that plaintiff independently obtained sufficient information about the treatment so as to conclude that there was an implied assumption of risk when she agreed to follow defendant’s protocol. (See, Boyle v Revici, supra; Schneider v Revici, supra.)
Pertaining to the award of punitive damages, such "damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as *234 well as others who might otherwise be so prompted, from indulging in similar conduct in the future” (Walker v Sheldon, 10 NY2d 401, 404 [1961]). In cases involving motions directed to a pleading or for summary judgment, it has been held that punitive damages may be awarded in a medical malpractice case (e.g., Graham v Columbia-Presbyterian Med. Ctr., 185 AD2d 753, 754 [1st Dept 1992] [conduct that is " 'intentional, malicious, outrageous, or otherwise aggravated beyond mere negligence’ ” may support an award of punitive damages]; Frenya v Champlain Val. Physicians’ Hosp. Med. Ctr., 133 AD2d 1000, 1000-1001 [3d Dept 1987] [an award of punitive damages requires a showing of "wrongful motive * * * willful or intentional misdoing, or a reckless indifference equivalent to willful or intentional misdoing * * * (and) in the case of a tort action, the defendant’s conduct must be so flagrant as to transcend mere carelessness”]; Jones v Hospital for Joint Diseases & Med. Ctr., 96 AD2d 498 [1st Dept 1983]). However, I have not located any case (other than an assault by a physician) where a verdict for punitive damages in a medical malpractice case has been upheld on appeal. For a lower court decision, see Gersten v Levin (150 Misc 2d 594 [Sup Ct, NY County 1991]).
In the case at bar, plaintiff offered evidence to show that defendant’s practice of prescribing nutrition as a cure was designed to enable companies in which he had a financial interest to sell product. While there was evidence offered by the defendant to the contrary, the jury was entitled to find that defendant’s intent in dealing with plaintiff was motivated by greed and that he was reckless in his care of her. It should be noted that although, as aforesaid, there is pending controversy between the medical establishment and nonconventional practitioners, defendant failed to produce a single witness at trial who defended his treatment of plaintiff as medically sound, whereas plaintiff’s experts clearly painted him as a charlatan. With only such evidence before it, I cannot say that the jury award on punitive damages was unsupported by the weight of the evidence. That the jury found that plaintiff had knowledge of the risks involved and thus impliedly assumed a risk of injury should not bar the jury from also awarding punitive damages based on conduct by a physician which it deemed reckless and improperly motivated.
In summary, both motions to set aside the verdict are denied and a judgment shall be entered in accordance with the jury verdict.