Nicholas J. **GONZALEZ,**
**M.D., Plaintiff,**

v.

Jack **GRAY, Defendant.**

No. 98 **CIV. 8818(RWS).**

United States District Court,
S.D. New York.

Oct. 21, 1999.

William R. Bishin, P.C., Roanoke Park Office, Seattle, WA, Kathleen Peratis, P.C., New York, NY, for Plaintiff.

Miller and Korzenik, New York, NY, By David S. Korzenik, Of Counsel, for Defendant.

## OPINION

SWEET, District Judge.

Defendant Jack Gray ("Gray") has moved, pursuant to Rules 12(b)6, 12(c), and 56 of the Federal Rules of Civil Procedure, for an order or summary judgment dismissing the complaint of plaintiff Dr. Nicholas J. Gonzalez ("Gonzalez"). As matters outside the pleadings have been presented to and not excluded by this Court, the motion will be treated solely as one for summary judgment. Gonzalez has moved to strike certain affidavits and declarations made in support of Gray's motion. On the facts and conclusions set forth below, Gray's motion is granted, Gonzalez's motion is denied, and the complaint is dismissed, with costs and disbursements to Gray.

### Prior Proceedings

This is the latest round in a hard-fought grudge match which commenced following the death of Gray's wife, Holly Schafer ("Schafer"), after her treatment by Gonzalez for Hodgkin's Disease. Gray, as Administrator of the Estate of Schafer, brought an action against Gonzalez on September 24, 1996, in the Supreme Court of New York, New York County, for the wrongful death of Schafer allegedly resulting from

Gonzalez's "criminal negligence" and Schafer's lack of "informed and knowledgeable consent" to Gonzalez's unscientific treatment. *Jack Gray, as Administrator of the Estate of Hollace Ann Schafer v. Nicholas J. Gonzalez, M.D.*, Supreme Court of the State of New York, County of New York, Index No. 116984/96 (hereinafter the "State Action").

The complaint charged, *inter alia:*

10. That [Gonzalez] was criminally negligent and liable in the care and treatment rendered to [Schafer].

11. That the injuries to [Schafer] were due to the carelessness and negligence of [Gonzalez] in failing to treat [Schafer] in the proper and accepted medical manner, and all without any fault or lack of care on the part of [Schafer or Gray].

12. That [Gonzalez] was negligent and careless in the care and treatment rendered to [Schafer]; in failing to provide the proven care and treatment needed for [Schafer's] condition; in embarking upon a series of unproved and ineffective "therapies"; and in otherwise being negligent in the premises.

. . . .

21. That [Gonzalez] failed to obtain from [Schafer] . . . an informed and knowledgeable consent to the treatment therefor and [Gonzalez] failed to advise and communicate to [Schafer] a knowledge and understanding of the risks, hazards and sequelae of the treatment rendered. . . .

22. That [Gonzalez] failed to disclose to [Schafer] the risks and benefits involved as a reasonable medical practitioner under similar circumstances would have disclosed in a manner permitting [Schafer] to make a knowledgeable evaluation.

23. That a reasonably prudent person in [Schafer's] position would not have undergone the treatment if she had been fully informed and that the lack of informed consent is a proximate cause of [Schafer's] injuries.

State Action Compl. ¶¶ 10–12, 21–23.

The Bill of Particulars attached to the Complaint additionally alleged that, *inter alia:*

The treatment by [Gonzalez] . . . deviated from standard and accepted medical practice [because Gonzalez] failed to use ordinary and reasonable medical care, diligence and skill, and failed to possess the requisite degree of learning, knowledge and skill; in recommending against high dose chemotherapy and autologous bone marrow transplantation, both acknowledged and universally recognized as the correct course of treatment for nodular sclerosis Hodgkin's Disease; on the contrary treating the decedent with quackery consisting of, inter alia, dietary manipulation, "immune stimulation," purges, vitamins, enzymes, pancreatic tissue consisting of animal tissue extracts; in delaying treatment; in embarking on quackery consisting of misleading the patient and the family into treatment with ineffective, unproven and unscientific "treatment."

State Action, Verified Bill of Particulars Item 16(c).

Dr. George Canellos ("Canellos"), an expert for Gray, is a professor of Oncology at the Harvard Medical School, Chief of Medical Oncology at the Dana Farber Cancer Institute in Boston, Editor–in–Chief of *The Journal of Clinical Oncology,* and author of many books and articles on the treatment of Hodgkin's Disease. When asked his opinion about Gonzalez's treatments for Hodgkin's Disease in a deposition on July 8, 1998, Canellos made the following statements:

I think it's outrageous. I think it's outrageous using such remedies of totally undemonstrated scientific value to treat a patient who still had a potentially curable disease with already understandable but acceptable treatment by all people who ever deal with Hodgkin's Disease. In my view none of those

things were ever shown by anybody to be useful for cancer, and most of it I think is based on myth.

Canellos went on to say that he has never seen any scientific literature on "any of these modalities in treating Hodgkin's Disease."

Discovery in the State Action is now complete, and trial is imminent.

Gonzalez filed his complaint in this action on December 14, 1998, seeking damages for defamation arising from certain statements made by Gray, and from a statement Gray allegedly "caused" another person to make, on ABC News. A pretrial conference was held on May 4, 1999, and discovery was stayed pending the filing on June 7 of the instant summary judgment motion. By letter, Gonzalez sought an adjournment of time to answer the motion and to depose Gray. The requests were granted on June 10, but Gonzalez then sought an adjournment of Gray's deposition, which was stayed pending resolution of the summary judgment motion, which was marked fully submitted on July 21, 1999. On July 31, Gonzalez filed his motion to strike, which was marked fully submitted on August 11, 1999.

### The Facts

The facts recounted below are set forth in the Rule 56.1 statements and the affidavits of the parties and are not in dispute except as noted. Gonzalez's separate motion to strike Gray's affidavits, and Gray's reply thereto, essentially contest the reliability and admissibility of certain of the evidentiary materials submitted in connection with the summary judgment motion. The Court finds no need to address Gonzalez's motion separately, as the allegations made therein have been considered in weighing the evidentiary value of the materials submitted by both parties and are reflected in the factual summary below.

Gray is a resident of Cambridge, Massachusetts. His now-deceased wife Schafer was an Assistant Professor of Music at the College of the Holy Cross in Worcester, Massachusetts. In 1977, Schafer was diagnosed with Hodgkin's Disease, a form of lymphatic cancer. She was treated with traditional cancer therapies (e.g., chemotherapy, radiation) with apparent success. Unfortunately, the disease reappeared in 1990. Once again, she underwent traditional therapy. In August 1992, she came under the care of Gonzalez and continued under his care until she died on April 26, 1995.

Gonzalez employed a "hair test" to determine the condition of Schafer's cancer and prescribed, *inter alia*, coffee enemas, vitamins, and nutritional supplements. He reported that her hair tests indicated a decreasing cancer rate, claiming that, on the basis of his therapy, Schafer's "cancer rate" had been reduced from 39 (high) to 9+ (in the "safety zone"). Schafer had a 9+ rating at the time of her death. However, Gonzalez's contemporaneous notes revealed that he was "surprised that she is still alive."

Gray alleges that Gonzalez was interviewed on a CBS News "48 Hours" special entitled "Healing or Hype?," which aired January 12, 1995, on an NBC special entitled "A Closer Look," which aired in July 1991, on an ABC News Special entitled "Healing or Hype?" in 1995, on National Public Radio in 1995, and on WBUR in September 1998, and that comments on Gonzalez and his therapies have also appeared in numerous books, articles, and other literature. Gonzalez admits to appearing on the CBS and ABC programs, and does not specifically contest any of the other alleged appearances.

In August 1993, Gonzalez was charged with professional misconduct arising out of his nutritional therapy treatment for cancer patients. An Administrative Review Board for Professional Medical Conduct of the New York State Department of Health suspended Gonzalez's license for three years and "stayed the suspension subject to [Gonzalez's] compliance with certain probationary conditions, among them community service and retraining."

Gonzalez brought an Article 78 Proceeding to challenge the Board's Decision and

Order. The Article 78 Proceeding was dismissed by the Appellate Division. *Gonzalez v. New York State Dep't of Health,* 232 A.D.2d 886, 648 N.Y.S.2d 827 (3d Dep't 1996), *leave to appeal denied,* 90 N.Y.2d 801, 660 N.Y.S.2d 554, 683 N.E.2d 19 (1997).

In 1991, Julianne Charell ("Charell") came under Gonzalez's treatment. Charell had been diagnosed with uterine cancer and had undergone a hysterectomy. Her physicians then recommended a course of radiation and chemotherapy. Charell sought a second opinion from Gonzalez. He dissuaded her from undergoing chemotherapy or radiation, instead recommending treatment "through his 'protocol' of a special diet, including six coffee enemas a day."

Upon returning to her initial doctors, Charell learned her condition had worsened. She subsequently brought a malpractice action against Gonzalez. A jury found Gonzalez negligent for persuading Charell to forego traditional treatment in favor of a nutritional protocol which by itself had no therapeutic value, and that Gonzalez did not obtain Charell's informed consent to the treatment. The jury also found that by accepting Gonzalez's treatment, Charell was responsible for assuming some of the risk. Charell was awarded over $2.5 million dollars in damages in addition to $150,000.00 in punitive damages. The jury verdict and the punitive damages award were upheld by the Honorable Edward Lehner on July 10, 1997. *See Charell v. Gonzalez,* 173 Misc.2d 227, 660 N.Y.S.2d 665 (1997). The Appellate Division upheld the award except as to punitive damages. *See Charell v. Gonzalez,* 251 A.D.2d 72, 673 N.Y.S.2d 685 (1st Dep't 1998), *leave to appeal denied,* 92

N.Y.2d 816, 684 N.Y.S.2d 187, 706 N.E.2d 1211 (1998).

In early autumn of 1998, Gray received a telephone call from a reporter at ABC News in New York seeking an interview about the State Action. Gray made all of the public filings and depositions in the lawsuit available to the ABC reporters.[1]

The transcript of the segment of the ABC News program "The Power of Belief," on which Gray appeared on October 6, 1998 (the "Transcript") to be interviewed by the ABC reporter John Stossel ("Stossel"), is as follows:

**Stossel:** (VO) In New York, Dr. Nicholas Gonzalez treats cancer with things like coffee enemas, pancreatic enzymes and organic food. The National Cancer Institute wants to study part of his treatment, which many patients say helped them. But others feel they've been seduced by a quack.

**Flynn Warmington:** It's a lifesaver to cancer patients, he says, a lifesaver.

**Stossel:** (VO) Flynn Warmington was Holly Schafer's best friend. Holly died of cancer just four months after Gonzalez told her cancer wasn't her main problem. This is a guy giving coffee enemas. Why would she believe him?

**Flynn Warmington:** If you get someone who's vulnerable, who has a desperate need having to do with life and death, whose life is threatened, they're very vulnerable to hearing what they want to hear.

**Gray:** This guy had killed her. He had lied to her.

**Stossel:** (VO) Jack Gray, Holly's husband, says Dr. Gonzalez discouraged Holly from getting a bone marrow

---

1. Gonzalez contests Gray's account of how contact was initiated with ABC. Counsel for Gonzalez, in a declaration pursuant to Rule 56(f), has suggested that his "contacts with ABC personnel" cast doubt on Gray's account, and that a deposition of Gray might cast further doubt. Yet counsel has provided no specific details from those "contacts"—or any other evidence—to support his allegations. Moreover, such doubt goes to the question of whether Gray acted with actual malice when he made the Statements—an element of Gray's fourth ground for dismissal. Since the Court does not base its decision in this motion on that ground, how Gray and ABC first met is irrelevant.

transplant that might have cured her. Gray is suing Gonzalez.

**Gray:** All of this hope that he was pumping her full of was just slime.

**Stossel:** (on camera) Maybe he kept her alive longer by giving her hope. I mean, bodies do heal themselves.

**Flynn Warmington:** Hope is a very good thing. There's no denying the value of hope. But hope is very unlikely to cure Hodgkin's Disease.

**Stossel:** (VO) Gonzalez would not do a television interview with me about this, but he defends his alternative approach and denies the charges in Jack Gray's lawsuit. And natural treatments like his are more popular than ever.[2]

Gonzalez's complaint in the instant action specifically alleges that Gray defamed Gonzalez with the statement, "He had killed her. He had lied to her." Additionally, Gonzalez alleges that Gray defamed Gonzalez by causing Stossel to state, by implication, that Schafer had "been seduced by a quack." (Hereinafter, the allegedly defamatory statements are referred to as the "Statements".)

*Discussion*

**I. *The Legal Standard***

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.,* 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell,* 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985).

Subject matter jurisdiction in this case rests upon diversity, so under familiar principles New York State substantive law will be applied, subject to applicable First Amendment requirements. *See, e.g., Law Firm of Daniel P. Foster v. Turner Broad. Sys., Inc.,* 844 F.2d 955, 959 (2d Cir.1988).

Gray's motion for summary judgment rests on six separate grounds: (1) the protection afforded reports of judicial pro-

---

**2.** Gonzalez objects to this characterization of the broadcast on two grounds. First, Gonzalez claims that the broadcast of the entire program, not simply the segment about Gonzalez and Gray, must be considered in order to understand the context in which the allegedly defamatory statements were uttered. Second, Gonzalez claims that the transcription as set forth above is incomplete because it does not accurately convey the non-verbal components of the broadcast (e.g., facial ex-

pressions, editing) that demonstrate the defamatory nature of the Statements. The Court notes that it has viewed with care the actual videotape of the entire broadcast in rendering its decision, and sets forth the transcription above of the most pertinent section of the broadcast simply as a written approximation in order to aid the understanding of readers of this opinion who have not seen the broadcast.

ceedings under § 74 of New York's Civil Rights Law; (2) the federal constitutional equivalent of § 74 set forth in *Florida Star v. B.J.F.,* 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989); (3) the protection New York law affords opinion and fair comment in an area of controversy; (4) Gonzalez's inability to provide "clear and convincing" evidence of Gray's actual malice required of a defamation plaintiff who is a limited-purpose public figure; (5) truth; and (6) the doctrine of "incremental harm." As set forth in detail below, this Court, having construed the evidence in the light most favorable to Gonzalez, finds that the allegedly defamatory statements are protected either as statements of opinion under New York constitutional and common law (Ground (3)), or, alternatively, by § 74 of the New York Civil Rights Law (Ground (1)). Because these grounds suffice to grant summary judgment to Gray and thereby dispose of the case, the Court need not consider the other grounds on which Gray urges summary judgment.

## II. *The Statements Are Non–Actionable Opinion*

 Under New York law, a publication "is libelous or actionable ... if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, 1305 (1977) (*quoting Sydney v. MacFadden Newspaper Pub. Corp.,* 242 N.Y. 208, 151 N.E. 209, 210); *see Levin v. McPhee,* 119 F.3d 189, 195 (2d Cir.1997). "[A] threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it." *Id.*

 "Because expressions of opinion are not actionable, the disposition of defamation actions frequently turns on the issue of whether the defendant's words constituted actionable assertions of fact or protected expressions of opinion." *Id.* at 196. In New York,

> the inquiry, which must be made by the court, entails an examination of the challenged statements with a view toward (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Gross v. New York Times Co.,* 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d 1163, 1167 (1993) (citations and internal quotation marks omitted); *accord Levin,* 119 F.3d at 196–97.

Applying the standard to the facts of the instant case, it is concluded that a reasonable viewer would understand the Statements to be expressions of opinion, not fact. While the Statements satisfy the requirements of the first two prongs of the inquiry—the Statements arguably possess a precise meaning and are capable of being proven true or false—the context in which the Statements are made makes clear that they are merely the opinion of Gray.

The broadcast in which the segment appears is ostensibly meant to debunk the mystery behind various types of practices which are not supported by scientific evidence, for example, firewalking, voodoo curses, and faith healing. In actuality, however, the broadcast wavers between debunking and titillation. Its primary purpose appears to be entertainment, not education.

The eighty-second segment in which Gray and Gonzalez appear comes in the middle of the broadcast. The segment cuts between footage of Gonzalez in his office examining patients and shots of Stossel interviewing Gray and Flynn Warmington, a friend of Schafer. As the

Transcript set forth in the statement of facts above indicates, Stossel identifies Gonzalez at the beginning of the segment as a doctor who employs alternative therapies for cancer such as "coffee enemas, pancreatic enzymes and organic food." The viewer is thus informed at the outset that Gonzalez is employing controversial methods, the merits of which are currently the subject of hot debate in this country, as both Gray's and Gonzalez's affidavits attest, and as the viewer is made to understand by the references to the National Cancer Institute's interest in Gonzalez's treatment and the statement, "But others feel they've been seduced by a quack." Given the obviously controversial nature of Gonzalez's methods, a reasonable viewer would understand the Statements as expressing Gray's opinion as to the validity of those methods.

Gray is shown uttering two statements: (1) "This guy had killed her. He had lied to her;" and (2) "All of this hope that he was pumping her full of was just slime." These statements are intercut with statements by Warmington, a friend of Schafer's, and with statements by Stossel, who informs the viewer that Gray "says Dr. Gonzalez discouraged Holly from getting a bone marrow transplant that might have cured her" and is suing Gonzalez, and that Gonzalez declined to be interviewed for the segment but "defends his alternative approach and denies the charges in Jack Gray's lawsuit."

A reasonable viewer would understand that Gray's statements are not statements of fact, but represent the opinion of a distraught widower who recently lost his wife to a terrible illness. The clearest indication of this is Gray's second statement—"All of this hope that he was pumping her full of was just slime"—a statement that, taken literally, makes no sense. A reasonable viewer, however, would understand the statement as a hyperbolic metaphor reflecting Gray's opinion of Gonzalez's treatment methods, "hope" and "slime" being the figurative equivalents of the coffee enemas and pancreatic enzymes Stossel refers to at the beginning of the segment. Gray only makes two statements during the segment, and the second statement, together with the text by Stossel, provide the context in which a reasonable viewer would understand Gray's allegedly defamatory statement to be simply Gray's opinion. *See, e.g., Steinhilber v. Alphonse,* 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550, 551 (1986).

Gonzalez's contention that a viewing audience would expect a broadcast like this to have been "carefully verified and edited for accuracy and reliability of factual assertion" is simply not credible. To the contrary, the main "expert" the program relies on to "debunk" the various nonscientific practices portrayed in the broadcast is not a highly respected scientist, but a former magician. The broadcast is thus far more interested in entertaining the viewer than in delivering a sober critique of the practices portrayed.

For these reasons, the Court finds that a reasonable viewer would understand the Statements to express the opinion of Gray. Since statements of opinion are not actionable under New York defamation law, summary judgment for Gray is appropriate.

### III. In the Alternative, the Statements Are Protected Under Section 74 of the New York Civil Rights Law

A reasonable viewer would also understand the Statements to be a substantially accurate report of two of the charges in the State Action and thereby protected under Section 74 of the New York Civil Rights Law.

Section 74 provides:

A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

N.Y. Civ. Rights Law § 74 (McKinney 1992).

The issue under § 74 is whether the Statements constitute a "fair and true report" of the State Action. Gonzalez contends that the Statements are neither a "report" of a judicial or other official proceeding, nor are they "fair and true."

Cases finding § 74 protection have held that a "report" of a judicial or other official proceeding can take many forms. *See, e.g., Law Firm of Daniel P. Foster,* 844 F.2d at 957 (three separate CNN broadcasts concerning FBI raids on lawyer's offices); *McNally v. Yarnall,* 764 F.Supp. 853, 855 (S.D.N.Y.1991) (lawyer interviewed for an article about lawsuit); *Zerman v. Sullivan & Cromwell,* 677 F.Supp. 1316, 1317 (S.D.N.Y.1988) (Wall Street Journal article entitled "Couple's Suits Against Five Brokers Raise Tempers in New York, Florida Courtrooms"); *Karp v. Hill & Knowlton, Inc.,* 631 F.Supp. 360, 361–62 (S.D.N.Y.1986) (press release by public relations agent); *El Greco Leather Prods. Co. v. Shoe World, Inc.,* 623 F.Supp. 1038, 1041 (E.D.N.Y.1985) (article in trade publication), *aff'd* 806 F.2d 392 (2d Cir.1986); *Gurda v. Orange County Publications Div. of Ottaway Newspapers, Inc.,* 56 N.Y.2d 705, 451 N.Y.S.2d 724, 436 N.E.2d 1326, 1326 (1982) (newspaper article reporting case); *Holy Spirit Ass'n v. New York Times Co.,* 49 N.Y.2d 63, 424 N.Y.S.2d 165, 399 N.E.2d 1185, 1186 (1979) (newspaper article, concerning guilty plea by former Congressional representative in investigation on South Korean influence-buying scandal, in which allegedly defamatory statements were quotes from intelligence reports on the scandal); *Glendora v. Gannett Suburban Newspapers,* 201 A.D.2d 620, 608 N.Y.S.2d 239, 240 (2d Dep't 1994) (civil action was subject of newspaper article in which allegedly defamatory comments were published); *Ford v. Levinson,* 90 A.D.2d 464, 454 N.Y.S.2d 846, 847 (1st Dep't 1982) (same). The range of factual patterns and the lack of any definitively articulated standard for determining what would constitute a "report" within the meaning of § 74 suggests that the inquiry must be resolved in the context of the specific facts of each case. The broadest applications have found reports of judicial proceedings to exist when the publications at issue simply relied in some way on materials from an official proceeding.

The outer limit could be said to be marked by *Corporate Training Unlimited, Inc. v. National Broadcasting Company, Inc.,* 868 F.Supp. 501 (E.D.N.Y.1994), a case which is not controlling here but which is nevertheless instructive. In *Corporate Training,* Judge Dearie declined to dismiss a defamation action on § 74 grounds because the "report" in question was not of a judicial proceeding. *See id.* at 509–10. *Corporate Training* involved a television broadcast of the NBC program "Dateline," entitled "Rambo Goes to Reykjavik," which related in narrative fashion the bizarre story of a husband-and-wife "commando" team who ran a business ("Corporate Training Unlimited") rescuing American children "abducted" overseas by non-custodial parents. The broadcast focused on a botched rescue attempt which landed the husband in prison in Iceland on a kidnapping conviction. Corporate Training Unlimited subsequently sued NBC for defamation, and NBC moved to dismiss under, *inter alia,* § 74.

Judge Dearie determined that "the way the [b]roadcast is stylized—as a succession of interviews with participants in the incident—belies the notion that NBC was even attempting to provide a fair and true report of a judicial proceeding." *Id.* at 509. Citing a string of cases in which the connection between the challenged report and the judicial or other official proceeding "has been far more direct," Judge Dearie concluded that the "ordinary viewer of the [b]roadcast would not have been under the

impression that he was being presented with a report of the Icelandic judicial proceedings—let alone a fair and true report of those proceedings." *Id.*

The broadcast at issue in this action has certain affinities with the one at issue in *Corporate Training.* Nevertheless, it is clearly distinguishable and falls well within the parameters of the cases cited above in which § 74 was determined to apply. Having viewed the broadcast in which the Statements were published in light of the case law background, this Court finds that a reasonable viewer would understand the Statements to be reports of a judicial proceeding. As the Transcript and the analysis in Part I, *supra,* demonstrate, the essence of the segment on Gonzalez is a report of Gray's lawsuit. Stossel mentions the suit twice in the eighty-second segment. He states that Gonzalez denies the charges. Significantly, no other Gonzalez patients are mentioned. If the segment was meant to be more than a report of Gray's suit, Stossel presumably would have mentioned the Charell verdict, which at the time of the broadcast had already been upheld by the Appellate Division. The segment is not a story about Gonzalez "told in narrative fashion," *Corporate Training,* 868 F.Supp. at 509, but a report of a lawsuit situated within a broader context. Under the standards set forth in the case law, the segment constitutes a report of a judicial proceeding.

To qualify for the protections of § 74, the report must also be fair and true. "For a report to be characterized as 'fair and true' within the meaning of the statute, ... it is enough that the substance ... be substantially accurate." *Holy Spirit,* 424 N.Y.S.2d 165, 399 N.E.2d at 1187. "[T]he language used therein should not be dissected and analyzed with a lexicographer's precision." *Id.*

The Statements are substantially accurate summaries of two of Gray's causes of action in the State Action. Gray's first cause of action alleges that Gonzalez's criminal negligence, carelessness, and use of "unproved and ineffective 'therapies'"

resulted in the death of Schafer. *See* State Action Compl., ¶¶ 9–11. Thus, in the context in which the statement is spoken, "This guy had killed her" would be understood to be a substantially accurate statement of the content of the first cause of action. Gray's third cause of action alleges that Gonzalez failed to disclose the risks and benefits of his treatment method to Schafer, and that if he had disclosed such risks, Schafer would not have consented to be treated by him. *See id.* ¶¶ 21–23. Thus, Gray's "He had lied to her," and Stossel's "But others feel they've been seduced by a quack" would be understood to be substantially accurate statements of the content of the third cause of action.

The case law supports this view. In *Ford,* the defendant bluntly declared that the plaintiff "sabotaged" their company, "used their position as a stockholder ... for their own personal benefit," and used their company "as a vehicle for getting models away from Elite." *Ford,* 454 N.Y.S.2d at 847. The latter claim was admittedly not even part of the complaint, but the New York Supreme Court found all the statements to be protected under § 74. *See id.* Similarly, in *Yarnall,* an attorney accused McNally of having "a houseful of quasi-LaFarges," *see Yarnall,* 764 F.Supp. at 855, while in *El Greco,* the defendant "added further allegations not contained in the court papers" to their aggressive statements to the press. *See El Greco,* 623 F.Supp. at 1042–43. Courts, including this one, *see, e.g., Yarnall,* 764 F.Supp. at 855, refuse to impose the kind of strict reading of § 74 that Gonzalez seeks.

Therefore, because this Court finds that the segment of the broadcast concerning Gonzalez is a report of a judicial proceeding, and that the Statements are, in the context of the segment, fair and accurate reports of such proceeding, § 74 of the New York Civil Rights Law operates as a bar to Gonzalez's defamation claim.

*Conclusion*

For the reasons set forth above, Gonzalez's claims against Gray will be dismissed with prejudice, with costs and disbursements to Gray.

Submit judgment on notice.

**It is so ordered.**