**Anthony DOBBIN, Plaintiff,**

v.

**Christopher ARTUZ, et al., Defendants.**

**No. 99 CIV 11912 RWS.**

United States District Court,
S.D. New York.

April 25, 2001.

Anthony Dobbin, Dannemora, NY, for Plaintiff Pro Se.

Eliot L. Spitzer, Attorney General of the State of New York by Melinda Chester–Spitzer, Assistant Attorney General, New York City, for Defendants.

## OPINION

SWEET, District Judge.

In this 42 U.S.C. § 1983 action, pro se plaintiff Anthony Dobbin ("Dobbin"), an inmate at the Green Haven Correctional Facility ("Green Haven"), seeks compensatory and punitive damages for injuries arising out of a fall down the stairs at that facility on January 18, 1998, which may have exacerbated his preexisting chronic back condition. Dobbin alleges that by failing to move him to a cell on the first floor of the facility, or the "flats," so that he would not have to use the stairs, the defendants were deliberately indifferent to his serious medical needs, which led to his fall and compounded his back problems.

Defendants Christopher Artuz ("Artuz"), George Schneider ("Schneider"), Charles F. Kelly, Jr., ("Kelly"), Colman S. Wilson ("Wilson"), William F. Glasser ("Glasser"), Sabina Kaplan ("Kaplan"), Norman H. Selwin ("Selwin"), Lynn G. Forgit ("Forgit"), Oliva A. McClean ("McClean"), and Byron Rodas ("Rodas") (collectively "defendants") have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Dobbin, who has been provided with the requisite notice advising him of his obligations in surmounting the challenge, opposes the motion only as to Artuz, Kelly, Kaplan, Selwin, McClean, and Rodas. Dobbin concedes that dismissal of the claims against Schneider, Forgit, Wilson, and Glasser, is appropriate.

For the reasons set forth below, the motion will be granted, and the action dismissed as to all defendants.

## The Parties

At the time this action arose, Dobbin was an inmate in the custody of the New York State Department of Correctional Services at Green Haven in Stormville, New York. He has subsequently been transferred to the Clinton Correctional Facility in Dannemora, New York.

Artuz was the Superintendent of Green Haven from May 1993 to April 2000, where he was responsible for the overall management and supervision of the facility's staff and inmates.

At all times relevant to this action, Kelly was a correctional officer with the rank of Lieutenant at Green Haven. His duties included acting as Watch Commander, Disciplinary Lieutenant, and conducting disciplinary Tier hearings, as well as investigating staff and inmate complaints. In January 1998, Kelly was assigned to investigate Dobbin's complaint that he had not been moved to a cell on the first floor of the facility, or the "flats."

Wilson, Green Haven's Health Services Sergeant, is responsible for maintaining security at the facility hospital and psychiatric unit, as well as at the areas surrounding the commissary and counseling offices. On January 18, 1998, he was assigned to work as the Housing Sergeant in charge of the F Block, where Dobbin was housed. He was one of the first correctional officers to arrive on the scene of Dobbin's accident.

At all times relevant to this action, Glasser was a Corrections Officer at Green Haven. On January 18, 1998, he was a member of the First Response Team, which required him to respond to emergencies in the facility and care for inmates involved therein.

Kaplan has been a Hub Senior Counselor and Program Committee Chairperson

at Green Haven since 1985. In that capacity, she has responsibility for giving inmates all paid assignments within the facility, such as academic, work or vocational assignments. At all times relevant to this action, she had been temporarily reassigned to double celling.

At all times relevant to this action, Dr. Selwin was the Acting Medical Director at Green Haven. His responsibilities included managing his caseload of patients, reviewing consults with administrators, seeing inmates on sick call, supervising medical staff and ensuring that patients were provided with adequate care. Dr. Selwin admitted Dobbin to the infirmary following his discharge from Saint Francis Hospital on January 18, 1998 as a result of the fall.

At all times relevant to this action, Forgit was a registered nurse at Green Haven. Working the emergency sick call shift, Forgit's responsibilities included examining and treating inmates at emergency sick call and in the infirmary, conducting physical examinations, and taking inmates' medical histories. She was also a member of the Medical Response Team responsible for responding to medical emergencies that arose within the facility. Forgit was one of the Green Haven staff members who responded to the alert after Dobbin fell.

McClean is a physician's assistant at Green Haven who examines and treats inmates during regular and emergency sick call, and makes rounds in the Special Housing and Protective Custody Units. When serving as the "on-call provider," McClean examines inmates who have medical emergencies. McClean admitted Dobbin to the Green Haven infirmary and ordered medication for him upon his return from St. Francis Hospital on January 19, 1998.

Rodas has been a physician's assistant at Green Haven since 1996. In that capacity, he examines and treats patients during regular and emergency sick calls. Rodas examined Dobbin soon after he was transferred to Green Haven from Sing Sing Correctional Facility ("Sing Sing") in 1997, and thereafter served as Dobbin's primary care provider, responsible for Dobbin's overall health care.

*Facts*

Except as otherwise noted, the following facts are undisputed.

Inmates arriving at Green Haven meet with a counselor, medical staff, members of the Program Committee to determine their work assignment, and receive an orientation. (Kaplan Aff. ¶ 8.) If an inmate states that he is unable to work for medical reasons, Program Committee staff refers the matter to the medical staff, who examine the inmate, review his file, and advise the Committee of any medical considerations pertinent to work assignments. (Kaplan Aff. ¶ 9.)

The determination of where inmates are housed depends on two factors: "job assignment" and medical need. (Kaplan Aff. ¶ 10.) Inmates are primarily housed in housing unit blocks near their work assignments. In addition, inmates may be moved to a cell on the "flats" if they have a specific medical condition requiring such a placement, medical staff authorizes the move, and submits a "work limitation form" to the Program Committee. (Kaplan Aff. ¶¶ 10–11, 13.) The Program Committee must forward the work limitation form to the Unit of Movement and Control before the move can be accomplished. (Kaplan Aff. ¶ 13.) Depending upon availability, the actual transfer of an inmate to a cell on the flats could take anywhere from one day to several weeks. (Kaplan Aff. ¶ 14.) Green Haven contains 84 cells on the flats, which are located on the same

floor as the law library, clinic, and mess hall. (*Id.*)

Dobbin was transferred from Sing Sing on June 6, 1997. As his medical records reflected that he had a history of back problems and had been diagnosed with a herniated disc, Green Haven medical staff scheduled a neurological consult and notified corrections staff that Dobbin had to sleep on a bottom bunk. (Spitzer Dec. Ex. M at 564.) Dobbin was assigned to a cell in the F–Block, on the second floor of the facility. (Kaplan Aff. ¶ 33.) On June 7, 1997, Dobbin requested an emergency sick call. Rodas authorized a permit for Dobbin with instructions that he be assigned only to a bottom bunk. (Rodas Aff. ¶ 16.)

Dobbin requested another emergency sick call on June 9, 1997, and complained to Rodas during his examination that he had pain on his left side, and had not yet been moved to a lower bunk. Rodas filled out a form instructing the Program Committee to move Dobbin to a bottom bunk, and sent a work limitations form to the Program Committee Chairman excusing Dobbin from work for one week. Dobbin was also scheduled for an appointment with a health care provider. (Spitzer Dec. Ex. M, at 566, 567; Rodas Aff. ¶ 17.)

Dobbin was moved to a bottom bunk in another cell on the second floor on June 13, 1997. (Kaplan Aff. ¶ 34.)

Rodas examined Dobbin on June 17, 1998, and, while Dobbin was walking slowly, his physical examination was otherwise unremarkable. Rodas submitted consultations for several tests for Dobbin's back based on a neurologist's prior recommendation. (Spitzer Dec. Ex. M at 566; Rodas Aff. ¶ 19.)

On June 18, 1997, Rodas issued a work limitation form for Dobbin, which specified that Dobbin may not stand long, bend, squat, push, or pull, but may walk, do hand work, light work, and must be assigned to a bottom bunk. (Spitzer Dec. Ex. M at 570; Kaplan Aff. ¶ 19; Rodas Aff. ¶ 20.)

Dobbin requested a block sick call on June 19, 1997 for chronic foot problems. Rodas examined him several days later, on June 24, 1997. (Rodas Aff. ¶ 21.)

After receiving the results of Dobbin's CAT scan, Rodas issued a second work limitation form recommending that Dobbin be placed on "medical unemployment," which would excuse him from working for medical reasons. (Kaplan Aff. ¶ 24.) In addition, Rodas scheduled a consultation with Dr. John Galeno, an outside physician specializing in orthopedic surgery. (Spitzer Decl. Ex. M at 554; Rodas Aff. ¶ 25.) Dobbin was placed on medical unemployment on July 21, 1997. (Kaplan Aff. ¶ 25.)

During the first few weeks of July 1997, Dobbin wrote to the Captain in command of security requesting to be moved to another cell because he did not get along with his cellmate. Dobbin's cellmate was moved out of the cell on July 15, 1997. (Kaplan Aff. ¶ 35.) On July 18, 1997, due to his transfer to a work assignment in the print shop, Dobbin was moved to a bottom bunk in a cell on the third floor, in the H-block. (Spitzer Dec. Ex. N; Kaplan Aff. ¶ 36.)

After requesting a sick call due to sciatic and foot pain, Dobbin was examined by staff physician Harry Mamis, who proscribed percocet and scheduled a consult with a podiatrist. (Spitzer Dec. Ex. M at 553; Rodas Aff. ¶ 26.) On July 31, 1997, Dr. Neal Dunkelman submitted a summary of Dobbin's EMG test, which indicated that Dobbin had chronic denervation in his left medial gastrocnemius muscle, consistent with a chronic left S1 radiculophaty. (Spitzer Dec. Ex. M at 562; Rodas Aff ¶ 27.)

Dobbin was moved again on August 2, 1997, after requesting a transfer from a double to a single cell. His new placement was on the second floor, in B-block. (Kaplan Aff. ¶ 37.) Three days later, a physiatrist examined Dobbin in connection with his lower back pain. Dobbin received a back brace and a referral for physical therapy.

Dr. Galeno met with Dobbin on August 11, 1997, and diagnosed him with NHP L–S spine. He recommended physical therapy and Naprosyn 500 milligrams twice a day, but, because Dobbin was "fully ambulatory and did not complain ... that he was having difficulty walking up and down the stairs at Green Haven" did not recommend that Dobbin limit physical activities, including walking or climbing stairs. (Spitzer Dec. Ex. M at 554; Rodas Aff. ¶ 29; Galeno Aff. ¶ 6.)

After complaining of pain during a sick call on August 14, 1997, Dobbin received a renewed pain medication prescription from staff physician, Dr. John Bendheim. (Spitzer Dec. Ex. M at 545; Rodas Aff. ¶ 30.)

On August 18, 1997, Rodas submitted two consultation requests for Dobbin: one for Dr. Galeno, and one for a podiatrist. (Spitzer Dec. Ex. M at 547; Rodas Aff. ¶ 31.)

Dobbin stayed in the second-floor cell until another inmate replaced him there after being reassigned to the kitchen on September 2, 1997, when Dobbin moved to a cell on the third floor. (Spitzer Dec. Ex. N; Kaplan Aff. ¶ 38.)

The next day, Dobbin requested a block sick call, complaining that his "back went out" after carrying his possessions up the stairs. Dr. Mamis examined him and prescribed percocet. (Spitzer Dec. Ex. M at 549; Rodas Aff. ¶ 32.)

On September 9, 1997, Rodas examined Dobbin, who complained of lower back pain and requested to be moved to a cell on the flats. Rodas was authorized to recommend that an inmate be moved to a cell on the flats for medical reasons, depending on the acuteness of the inmate's condition and the amount of pain involved. (Rodas Aff. ¶¶ 11, 12.) Although neither Dr. Galeno, Dr. Dunkelman or any other outside specialist who had examined Dobbin had ever recommended that he avoid walking up stairs or be moved to the flats, Rodas thought it would be more convenient for Dobbin to live on the flats. As a result, Rodas sent a work limitations form to the Program Committee with instructions to Movement and Control to move Dobbin to the flats. (Spitzer Dec. Ex. M at 533, 539; Rodas Aff. ¶¶ 32, 33.) In addition, Rodas gave Dobbin the option of receiving all his meals in his cell until the move, in order to avoid using the stairs. Dobbin refused, citing his need to use the law library. (Spitzer Dec. Ex. M at 533, 539; Rodas Aff. ¶ 33.)

Notwithstanding the work limitations order, Dobbin remained in the third-floor cell until December 15, 1997, when he was moved to another cell on the same floor. Meanwhile, Dobbin requested sick calls for various ailments on September 23, September 30, October 9, October 10, October 16, October 21, October 22, October 28, November 4, November 10, November 17, November 25, 1997, and was seen by medical personnel on September 30, October 9, October 14, November 5, November 7, and November 10, 1997,[1] but did not renew his

---

1. This visit was with Dr. Galeno, who found that although Dobbin still had a herniated disk, his condition had remained unchanged and there had been no deterioration of his

back since his first examination of Dobbin in August of 1997. Dobbin complained of ongoing pain, but stated that his physical therapy had improved his condition, and did not make

request to be moved to the flats until November 28, 1997. (Spitzer Dec. Ex. M at 524, 526, 527, 528, 530, 531, 532, 539, 543, 547.) Rodas sent the Program Committee a copy of the original work limitation form recommending that Dobbin be moved to the flats, adding a handwritten notation, "copy sent again on 11/28/97." (Spitzer Dec. Ex. M at 530, 539; Rodas Aff. ¶ 53.)

On December 5, 1997, Dobbin complained to Rodas for a third time about not having been moved to the flats. Rodas made a note in Dobbin's ambulatory health record to call Movement and Control the following Monday, December 8, 1997. (Spitzer Dec. Ex. M at 522; Rodas Aff ¶ 55.)

During Rodas's examination of Dobbin on December 10, 1997, Dobbin complained again about not being moved to the flats. Immediately following the examination, Rodas submitted another form to Movement and Control with instructions to move him to the flats. (Spitzer Dec. Ex. M at 515, 522; Rodas Aff ¶ 57.)

Dobbin requested sick calls on December 19, December 22, 1997, but did not mention the move or any discomfort or difficulty associated with climbing stairs.

On January 5, 1998, Dobbin complained to Rodas again about the move, and Rodas sent yet another work limitation form, this time to the Program Committee Chairman with instructions to move Dobbin to the flats. (Spitzer Dec. Ex. M at 500; Rodas Aff ¶ 64.)

The next day, in response to renewed complaints, Rodas issued Dobbin a medical permit to "lock on flats only." (Rodas Aff. ¶ 65.)

Dobbin was still housed in the third-floor cell on January 18, 1998, when he slipped and fell on a flight of stairs while descending with two other inmates. (Spitzer Dec. Ex. B at 104, 118) Although he was wearing his back brace, Dobbin felt familiar sharp pains through his lower back and down his left leg, and collapsed after slipping on a piece of plastic. (Spitzer Dec. Ex. B at 103–05.) Emergency medical staff and correctional officers, including defendants Forgit, Schrader, Glasser, and Wilson, responded to Dobbin's call of distress. After asking Dobbin what had happened and assessing the seriousness of his medical condition, Wilson, Glasser and Forgit placed him on a backboard, put him on a stretcher, and transported him to the clinic. (Spitzer Dec. Ex. M at 501–02; Wilson Aff. ¶ 12; Forgit Aff. ¶ 20.)

Once in the clinic, Forgit paged Rodas, who instructed her to send Dobbin to an outside hospital for further evaluations, including x-rays. (Spitzer Dec. Ex. M at 501, 502, 507.) Dobbin was taken to Saint Francis Hospital, where he was diagnosed with "acute lower back contusion with muscle spasm. No clinical signs of motor nerve sensory defect in lower extremities." (Rodas Aff. ¶ 69.) Analgesics were prescribed, and a follow-up examination by a neurologist recommended. (Id.) No instructions were issued to bar Dobbin from climbing or walking, or to move him to housing in a location that would minimize the need to climb stairs.

Rodas examined Dobbin on January 23, 1998 and did not find any change in his condition. Nor did Dr. Galeno find that Dobbin's condition had changed when he examined him on January 26, 1998 since his prior examination in August 1997. Nonetheless, due to Dobbin's continued complaints about persistent back pain, Dr. Galeno recommended back surgery.

any mention of pain or difficulty associated with climbing stairs. (Galeno Aff. ¶¶ 7–9.)

Although he had returned to Green Haven on January 19, 1997 and was discharged from the infirmary on January 21, Dobbin was not moved to the flats until February 11, 1998. (Spitzer Dec. Exs. M at 301, 509; N.) Between September 9, 1997, when he had first requested to be moved to the flats, and February 11, 1998, when he was first moved down from the higher floors, Dobbin visited the ground-floor law library approximately 86 times. (Lonczak Aff. ¶ 14.) He first filed a grievance regarding the delayed move on February 5, 1998, after his fall. (Spitzer Ex. A, p. 13 at ¶ 34.)

Dr. Galeno performed a lumbar laminectomy L5–S1, disc excision at (L) and decompression laminectomy L40L5 at St. Agnes Hospital in White Plains, New York, on April 14, 1998. Dobbin remained hospitalized for several days, and returned to a cell on the flats in Green Haven upon his return.

### Procedural History

After exhausting administrative procedures, Dobbin, acting pro se, filed the instant § 1983 action on December 9, 1999, claiming that the failure to move him to the flats was in deliberate indifference to his serious medical needs, in violation of his rights under the Eighth and Fourteenth Amendments of the United States Constitution.

On January 17, 2001, the defendants filed this motion for summary judgment, arguing that the action should be dismissed for failure to prove a serious medical need to be moved to the flats, because the facts alleged fail to prove deliberate indifference, and because the defendants were not personally involved, and entitled to qualified and/or Eleventh Amendment immunity. After receiving an extension on the time in which to respond, Dobbin filed a brief and supplementary materials in opposition to the motion on March 12, 2001. Defendants, too, sought and received an extension of the reply period, and filed further submissions in support of their motion on March 28, 2001, whereupon the motion was deemed fully submitted.

### Discussion

### I. Applicable Legal Standards

### A. Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.,* 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell,* 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248,

106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

While all reasonable ambiguities and inferences should be resolved against the moving party, those inferences must be supported by affirmative facts and must be based on relevant, admissible evidence. *See* Fed.R.Civ.P. 56. A party seeking to defeat a summary judgment motion cannot " 'rely on mere speculation or conjecture as to the true nature of facts to overcome the motion.' " *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (citation omitted).

Although these standards apply where the plaintiff is pro se, the court should read the submissions of a pro se litigant "liberally and 'interpret them to raise the strongest arguments they suggest.' " *McPherson v. Coombe*, 174 F.3d 276, 279 (2d Cir.1999) (*quoting Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994)).

### B. *Section 1983 Liability*

■ Section 1983 imposes liability for acts taken under color of state law which deprive a plaintiff of "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Supreme Court has interpreted the "plain words" of this statute as imposing liability "only for conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and its laws." *Rizzo v. Goode*, 423 U.S. 362, 370, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (citation omitted). Thus, in order to prevail on a section 1983 claim, the plaintiff must prove that the defendant: (1) acted, (2) under color of state law, (3) in a manner which deprived the plaintiff's constitutional rights. *See, e.g., Candelaria v. Coughlin*, 787 F.Supp. 368, 372 (S.D.N.Y.1992), *aff'd*, 979 F.2d 845 (2d Cir.1992).

■ Thus, a defendant's personal involvement in the alleged constitutional violation is a prerequisite to recover damages, *see Rizzo*, 423 U.S. at 371–77, 96 S.Ct. 598; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995) ("[i]t is well-settled in this circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983' ") (*quoting Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986)) (internal citations omitted); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir.1987).

■ In addition, the plaintiff must allege that the defendants "were directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 886 (2d Cir.1987); *see also Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir.1987) ("Absent some personal involvement by [the Superintendent of a DOCS facility] in the allegedly unlawful conduct of his subordinates, he cannot be held liable under section 1983."). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir.) (*respondeat superior* does not show personal involvement under § 1983), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

### C. *The Eighth Amendment*

■ The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. Amend VIII. In order to establish an Eighth Amendment claim arising from inadequate medical care, a prisoner must prove "deliberate indifference to his serious medical needs." *Chance v. Armstrong*, 143 F.3d 698, 702

(2d Cir.1998) (*quoting Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Plaintiff must establish that prison officials intentionally denied or delayed access to medical care or intentionally interfered with prescribed treatment. *See id.* at 104–05, 97 S.Ct. 285.

 The deliberate indifference standard incorporates an objective prong and a subjective prong. The inmate must establish (1) that the deprivation is "sufficiently serious" and (2) that the prison official has a sufficiently culpable state of mind. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A sufficiently serious medical deprivation exists where there is "a condition of urgency, one that may produce death, degeneration or extreme pain." *Id.* at 66. A sufficiently culpable state of mind on the part of prison officials exists where the officials are aware of the prisoner's serious need and deliberately disregard it. *Id.* at 68.

Examples of conditions considered by the Second Circuit Court of Appeals to be "sufficiently serious" under the Eighth Amendment vary a great deal, but include the failure to provide prescribed medication in the face of an inmate's extreme weight loss and deteriorating condition, *see Kaminsky v. Rosenblum,* 929 F.2d 922, 924 (2d Cir.1991), a delay in removing broken pins from a prisoner's hip for more than two years despite nearly fifty complaints of pain, *see Hathaway,* 37 F.3d at 65–6, and chronic tooth pain lasting at least six months, rendering the prisoner unable to chew, and resulting in as many as three teeth degenerating to the point of requiring extraction, *see Chance,* 143 F.3d at 702.

 To establish the subjective component, Dobbin would have to demonstrate that defendants "kn[ew] of and disregard[ed] an excessive risk to [his] health or safety." *Farmer v. Brennan,* 511 U.S.

825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Prison officials are not liable "if they responded reasonably to a known risk, even if the harm ultimately was not averted." *Farmer,* 511 U.S. at 826, 114 S.Ct. 1970; *see also Estelle,* 429 U.S. at 106–7, 97 S.Ct. 285 (prisoner not entitled to treatment by every medical alternative as long as treatment is reasonable).

 Thus, negligence or medical malpractice is insufficient to support a claim of deliberate indifference. *See Hendricks v. Coughlin,* 942 F.2d at 113; *see also Estelle,* 429 U.S. at 105–06, 97 S.Ct. 285. Moreover, mere differences of opinion regarding medical treatment do not give rise to an Eighth Amendment violation. *See Estelle,* 429 U.S. at 107, 97 S.Ct. 285; *see also Chance,* 143 F.3d at 703.

### D. *Immunity*

 Under the doctrine of qualified immunity, public officials engaging in discretionary activities are shielded from liability for civil damages if they establish that (1) their conduct did not violate clearly established rights of which a reasonable person would have known; or (2) that it was "objectively reasonable" to believe that their acts did not violate clearly established rights. *See Anderson v. Creighton,* 483 U.S. 635, 637–41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Mozzochi v. Borden,* 959 F.2d 1174, 1177 (2d Cir.1992). This defense protects government officials such as prison authorities from "the burdens of defending expensive but ultimately unsubstantial, lawsuits and also guards against the risk that 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.' " *Estate of Rosenbaum v.*

*City of New York*, 975 F.Supp. 206, 215 (E.D.N.Y.1997) (*quoting Anderson*, 483 U.S. at 638, 107 S.Ct. 3034); *see Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995).

■ The Eleventh Amendment bars a § 1983 action for damages brought against public officers in their official capacity, absent the state's consent, because the state is the real party in interest. *See Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993); *Dube v. State University of New York*, 900 F.2d 587, 594 (2d Cir.1990).

## II. *The Summary Judgment Motion is Granted*

The crux of Dobbin's claim is that by failing to house him in a cell on the flats, the defendants were deliberately indifferent to his serious medical need. As a preliminary matter, Dobbin must establish that it was medically necessary for him to avoid climbing stairs in order to prevail. Absent this showing, there can be no finding that the defendants responsible for his medical care and housing placement were deliberately indifferent.

■ Dobbin has effectively shown that his chronic back injury caused him severe and near constant pain, and was as an objective matter therefore "sufficiently serious" to support a § 1983 claim. *See Cole v. Artuz*, No. 97 Civ. 0977(RWS), 2000 WL 760749 (S.D.N.Y. June 12, 2000) (holding that inmate's chronic back injury satisfied objective prong of deliberate indifference claim). Hundreds of pages of medical records reflect that Dobbin had been diagnosed with a herniated disk even before arriving at Green Haven, and that he frequently complained of severe back and leg pain after arriving. (Spitzer Dec. Ex. M.)

With respect to the subjective component, as the Second Circuit has noted, "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Chance*, 143 F.3d at 703. A claim for negligence or medical malpractice does not state a claim for a constitutional violation. *See Estelle*, 429 U.S. at 107, 97 S.Ct. 285.

■ Although Dobbin requested to be moved to the flats on several occasions starting in September of 1997, he has failed to demonstrate any medical need for such an action. The Supreme Court has held that inmates are entitled to reasonable treatment, not the specific treatment they desire. *Farmer*, 511 U.S. at 826, 114 S.Ct. 1970; *Estelle*, 429 U.S. at 106–7, 97 S.Ct. 285; *Chance*, 143 F.3d at 703 (mere disagreement over proper treatment does not state constitutional claim). The uncontroverted evidence establishes that Dobbin regularly received sick calls and medication upon request, including numerous consultations with outside specialists in connection with his back condition, as well as his foot condition and vision. (Spitzer Dec. Ex. M.) Defendant Rodas was particularly responsive to Dobbin's complaints, repeatedly examining him, renewing prescriptions, scheduling consultations with outside professionals, and submitting duplicate move authorizations in an attempt to make Dobbin more comfortable. (*Id.* at Exs. B, M; Rodas Aff.)

Defendant Rodas first recommended that Dobbin be moved in September of 1997 not due to any medical necessity, but simply because he felt would be "more convenient" for Dobbin to live on the same floor as the mess hall, clinic, and law library. (Spitzer Dec. Ex. M at 533, 539; Rodas Aff. ¶¶ 32, 33.) He offered to authorize Dobbin to receive his meals in his cell so that he would not have to walk unnecessarily, but Dobbin refused, wanting to remain able to "get some fresh air"

on occasion and make full use of the law library to research his criminal appeal.[2]

Of all the medical professionals who examined Dobbin's back—whether before or after his transfer to Green Haven—none ever recommended that he limit his walking, refrain from climbing stairs, or be moved to a cell on the ground floor.

The affidavit of Dr. Galeno, who is not named as a defendant in this case, is particularly significant in this regard. At the time he treated Dobbin on two occasions in 1997 prior to the accident, Dr. Galeno had been a practicing physician for almost twenty years, specializing in orthopedic surgery with a sub-specialty in spine surgery. For inmates who are "either unable, or ... having great difficulty, walking throughout the facility," Dr. Galeno recommends that they be moved to the ground floor. (Galeno Aff. ¶ 2.) At both of his examinations, Dobbin was fully ambulatory and did not complain about any difficulty or additional pain associated with walking or climbing. (Galeno Aff. ¶ 4–9.)

As a result, Dr. Galeno did not recommend that Dobbin avoid stairs or be moved to the flats. From August 1997 through April 1998, in Dr. Galeno's medical opinion:

> there was absolutely no medical contraindication limiting plaintiff's use of the stairs. Although it might have been more convenient for [Dobbin] to avoid walking up the stairs, such a restriction was in no way medically required. Thus, between September 1997 and April 1998, there was no medical necessity for plaintiff to be housed in a cell

located on the ground floor of the facility.

(Galeno Aff. ¶ 13.) Dobbin has introduced no evidence placing this diagnosis in dispute. His requests to be moved placed certain Green Haven staff on notice of his *desire* to be housed on the flats, but in and of themselves were insufficient to demonstrate a serious medical *need* for such a move. Dobbin was receiving regular medication and physical therapy, which, he repeatedly reported to medical staff, he felt alleviated his pain. (Spitzer Dec. Ex. M.)

Moreover, the fact that Dobbin fell is insufficient to demonstrate that there had been a serious medical need for him to avoid the stairs *before* he fell. First, he had never fallen before January 18, 1998. As set forth above, nothing in Dobbin's complaints to medical professionals or their examinations of him suggested that stairs posed any difficulty or additional threat to his chronic back condition. In addition, Dobbin stepped on a "slippery" piece of "plastic" on the stairs before he fell. (Spitzer Dec. Ex. B at 103–05.) This admission complicates the argument that his back condition caused the fall (or that it would have caused the fall even if the stairs had been swept clear), which is a necessary link in the legal chain to liability.

As such, Dobbin has failed to create a genuine issue of material fact as to a required element of his § 1983 action—serious medical need to be moved to the flats or to avoid stairs—and the defendants' motion for summary judgment will therefore be granted.

---

**2.** The defendants make much of Dobbin's many visits to the law library while housed on cells one or two flights up, apparently suggesting that if Dobbin were truly in need of avoiding the stairs he would have been content to limit his legal work to perusing the two law books per day that he could have had

brought to his cell. However, like every prisoner, Dobbin is constitutionally guaranteed a right of access to legal materials, and, in any case, his use of the law library is simply not dispositive of the question of his medical need to avoid stairs.

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is hereby granted and the action dismissed.[3]

Pursuant to the Prisoner Litigation Reform Act of 1996 ("PLRA"), 28 U.S.C. § 1915(a)(3), I certify that any appeal taken from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

It is so ordered.

---

3. Although they have not been identified, and therefore have not joined in the defendants' motion, summary judgment is also appropriate as against defendants John Doe # 1—# 3 on the grounds set forth above.